# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

IN RE OXYCONTIN ANTITRUST LITIGATION :    MDL DOCKET 1603 (SHS)

This document relates to:

NEW MEXICO UFCW UNION'S AND
EMPLOYERS' HEALTH AND WELFARE
TRUST FUND, on behalf of itself
and all others similarly situated,

Plaintiff,

v.

PURDUE PHARMA, L.P., PURDUE
PHARMA, INC., PURDUE FREDERICK
COMPANY, ABBOTT LABORATORIES, and
ABBOTT LABORATORIES, INC.

Defendants.

-------------------------------------------------------x

**06 CV 0354**

Civil Action No. _____



## ORIGINAL CLASS ACTION COMPLAINT

NOW INTO COURT comes the Representative Plaintiff, New Mexico UFCW Union's and Employers' Health and Welfare Trust Fund, by counsel, on behalf of itself and on behalf of each member of the Plaintiff Class, and for its causes of action for its Original Class Action Complaint, alleges as follows, based on personal knowledge as to its own acts, review of documents available through this multi-district litigation, testimony of relevant witnesses and its attorneys' investigation:

## NATURE OF THE ACTION

1.     From 1995 through the present, Defendants created and implemented a fraudulent marketing and sales scheme to substantially increase the sales of the prescription drug oxycodone HCL, marketed and sold as OxyContin® (hereinafter referred to as "OxyContin"), and reap unlawful profits at the expense of Medicare patients, healthcare insurers, consumers and others. Defendants systematically, among themselves and with other entities and individuals, created a pervasive, illegal system to cause individual patients and their insurers to overpay substantial amounts of money for the specific purpose of increasing the market share of these drugs and maximizing their profit at the expense of Plaintiffs.

2.     Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on its own behalf and as a representative of a nationwide class consisting of all insurance providers and other third party payors, including self-funded plans, but excluding governmental entities, in the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for OxyContin prescribed for indications not approved by the FDA.

3.     This is a class action for damages brought by the Representative Plaintiff on behalf of a class of third party payors that have paid and provided, and will continue to pay for or provide, health care benefits to their members and insureds as a direct and proximate result of their members and insureds having been prescribed, supplied with, and taken the drug OxyContin, as researched, designed, formulated, compounded, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed or otherwise placed in the stream of interstate commerce by the Defendants. This action seeks, among other relief, general and special damages and equitable relief, including but not limited to recovery for prescription costs, restitution, refunds, and/or for equitable;

2

injunctive and declaratory relief against the Defendants, which tested, marketed, distributed, promoted and sold OxyContin.

## THE PARTIES

4.      The Representative Plaintiff, New Mexico UFCW Union's and Employers' Health and Welfare Trust Fund ("NMUFCW") is a Taft-Hartley fund with its principle place of business in Albuquerque, New Mexico.  Plaintiff, NMUFCW has paid or reimbursed eligible trust participants' prescription drug benefits for OxyContin and was injured by the conduct alleged herein.

5.      Defendant Purdue Pharma, L.P. was and is a limited partnership with its principal place of business located on One Stamford Forum, Stamford, Connecticut.  At all times relevant herein Purdue Pharma, L.P. was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin.

6..     Defendant Purdue Pharma, Inc. was and is a Delaware corporation with is principal place of business located at One Stamford Forum, Stamford, Connecticut.  At all times relevant herein, Purdue Pharma, Inc. was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin.

7.      Defendant Purdue Frederick Company was and is a Delaware corporation with its principal place of business in Norwalk, Connecticut.  At all times relevant herein, Purdue Frederick Company was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin.

8.      Defendant Abbott Laboratories was and is an Illinois corporation with its principal place of business in Abbott Park, North Chicago, Illinois.  At all times relevant herein,

3

Abbott Laboratories was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin.

9.    Defendant Abbott Laboratories, Inc. was and is a Delaware corporation with its principal place of business in Abbott Park, North Chicago, Illinois. At all times relevant herein, Abbott Laboratories was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Representative Plaintiff and the Defendants. Further, this Court has jurisdiction over this action because this is a putative diversity class action lawsuit in which over $5,000,000 is at issue and there are more than one hundred putative class members.

11.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining common law and state law claims.

12.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965, the acts and omissions at issue in this case occurred in the United States and within the geographical boundaries of this Federal District.

## FACTUAL ALLEGATIONS

13.    OxyContin is a narcotic pharmaceutical which contains oxycodone HCL, an opioid agoninst. Defendant, Purdue Pharma, L.P., developed and patented OxyContin, which was launched in December, 1995. Defendants, Abbott Laboratories and Abbott Laboratories, Inc. co-promoted OxyContin. OxyContin was approved for use in the management and treatment of

4

patients with moderate to severe pain who are expected to need continuous opioids for an extended period of time.

14.     OxyContin was initially available in 10 mg, 20 mg, and 40 mg tablet strengths. In 1997, OxyContin 80 mg tablets became available and in July, 2000, 160 mg tablets became available.

15.     OxyContin is a federally controlled, Schedule II substance. As such, (1) it has a high and foreseeable potential for abuse; (2) its medical use in the United States is severely restricted; and (3) the abuse of the drug may lead to severe psychological or physical dependence. Because OxyContin is a Schedule II drug, a prescription cannot even be called in to the pharmacy by the patient's doctor; rather, the patient must hand-carry the written prescription to a pharmacy.

16.     OxyContin tablets are manufactured with a controlled-release or time-release formulation. OxyContin tablets are taken every twelve (12) hours, as opposed to short acting pain medications which must be taken every three to six hours. However, because of its controlled-release or time-release formulation, OxyContin contains more milligrams of Oxycodone than any other drug on the market containing Oxycodone. For example, the 160 mg. form of OxyContin contains as much of the active ingredient Oxycodone as thirty-two (32) Percocet pills.

17.     At various times relevant herein, Defendants developed, designed, tested, manufactured, marketed, advertised, promoted, distributed and/or sold OxyContin for the management of pain.

18.     Following the launch of the drug in December, 1995, sales quickly skyrocketed. During 2000, just four (4) years after its introduction into the marketplace, OxyContin ranked 36th in sales in the United States of all prescription medications, with a total sales volume of $601,128,000.00, resulting from 3,505,000 prescriptions that year.

19.    The enormous sales volume of OxyContin was due primarily to Defendants' aggressive, nationwide and uniform marketing strategy (the "marketing strategy") aimed at physicians, pharmacists, and patients. Defendants developed this marketing and advertising strategy with the intent that physicians would prescribe OxyContin and pharmacists would fill prescriptions for OxyContin. However, that marketing strategy,which was heavily coercive, misrepresented the appropriate uses for OxyContin and failed to adequately disclose and discuss the safety issues and possible adverse effects of OxyContin use.

20.    In fact, on May 11, 2000, the United States Food and Drug Administration (FDA) issued a warning letter to Purdue Pharma ordering it to cease the use of a standard Purdue Pharma advertisement that stated and/or implied that OxyContin could be used to treat arthritis pain without first using milder drugs. That FDA letter stated, in pertinent part:

> You must present the headline, 'Proven Effective in Arthritis Pain' on the first page of the journal ad, followed by the results of a study conducted on 133 patients with moderate to severe osteoarthritis on the second page. This presentation suggests that OxyContin has been studied in all types of arthritis and can be used as a first-line therapy for the treatment of osteoarthritis... You should immediately discontinue the use of this journal advertisement and all other promotional materials for OxyContin that contain the same or similar claims or presentations.

(Purdue later withdrew the advertisement in question.)

21.    Similarly, Defendants' sales representatives (also known as "detail persons") were sent by Defendants into the medical community with highly coercive but uniform, marketing tactics and advertising/promotional materials developed by Defendants with the intent that physicians would prescribe OxyContin and pharmacists would fill these prescriptions for OxyContin. Upon information and belief, Defendants and their employees or agents represented to physicians and pharmacists that OxyContin "was safe enough to treat short-term pain", that it should be prescribed

to elderly women with osteoarthritis, and that it should be prescribed "for everything," including moderate and low back pain.

22.    In addition, Defendants "courted" physicians by paying doctors' transportation and hotel costs to attend weekend meetings to discuss pain management. At these meetings, Defendants would then recruit doctors and pay them fees to speak to other doctors at the more than 7,000 "pain management" seminars sponsored by Defendants around the United States. At those seminars, Defendants continued their nationwide, uniform marketing strategy of misrepresentation by marketing OxyContin as a safe and effective way in which to treat all types of pain, including minor pain. Despite their knowledge to the contrary, Defendants failed to provide the complete safety and risk information, much less mention the fact that OxyContin was intended only to treat moderate to severe pain, or that it had an extraordinary potential for abuse.

23.    Moreover, despite knowing that OxyContin could only be prescribed by a physician, Defendants pursued their uniform, nationwide marketing strategy of misrepresentation through marketing tactics aimed directly at consumers. As an example of that nationwide strategy, Defendants financed an Internet site called "Partners Against Pain." Through this public relation website, defendants continued their national marketing strategy, promoting OxyContin directly to members of the public. At least one purpose of this website was to induce consumers to purchase OxyContin. Despite their knowledge to the contrary, Defendants failed to provide consumers with complete safety and risk information, much less mention the fact that OxyContin was intended only to treat moderate to severe pain, or that it had an extraordinary potential for abuse.

24.    At all times relevant herein, the national marketing strategy used by Defendants, as outlined above, was intended to create a market demand for OxyContin induce the purchase and

sale of OxyContin tablets and allow Defendants to charge more for OxyContin than they otherwise would have been able to charge, absent the market penetration of OxyContin.

25.     As a result of their nationally developed, aggressive marketing tactics, Defendants achieved their intended purpose. OxyContin rapidly became one of the most widely used painkillers in the United States.

26.     Moreover, through their aggressive, nationwide and uniform marketing campaigns, Defendants encouraged the inappropriate prescription of OxyContin in order to raise their market share of OxyContin exponentially in a very short time. Consequently, this, too, has allowed Defendants to further their dominant share in the pharmaceutical "pain" market.

27.     Moreover, Defendants were facilitating the inappropriate use of OxyContin by supplying pharmacists in Mexico with OxyContin, because Defendants were aware that members of the public (consumers) could obtain OxyContin from those pharmacists without a prescription.

28.     Upon information and belief, OxyContin can be and is abused by crushing and/or dissolving the product, which creates a feeling of euphoria similar to that experienced when taking heroin.  This type of use allows persons to obtain the full effect of an entire does of OxyContin immediately, rather than over the intended, time-release period. Despite their awareness of the abuse of OxyContin by crushing and/or dissolving it to bypass the time-release mechanism, Defendants failed to take any steps to reformulate OxyContin to prevent its abuse in this matter.

29.     Specifically, Defendants failed to incorporate into the product formulation any feature that would have reduced the risk of bypass, diversion and abuse, all contributing to high risk of misuse and/or addiction. Accordingly, as the use of OxyContin by intended consumers mushroomed, so did the numbers of people who were being put at risk of misuse and/or addiction to

8

the drug. (Recently, Defendant, Purdue, announced an intent to reformulate OxyContin with an anti-narcotic addictive that would prevent this form of abuse).

30.    Despite Defendants' awareness of the rising tie of abuse of OxyContin in the aforementioned ways, Defendants continued their aggressive, uniform, nationwide marketing strategy for OxyContin, and failed to take appropriate measures to ensure that OxyContin was prescribed only in appropriate circumstances.

31.    Ultimately, the use and abuse of OxyContin engendered by Defendants' uniform, nationwide marketing practices and overwhelming market share of the drug, grew to such a level that the Federal drug enforcement officials asked Purdue to limit distribution of OxyContin to doctors who manage pain. This was the first time that the Drug Enforcement Agency (DEA) had targeted a specific prescription drug to curb its misuse.

32.    As a result of Defendants' deceptive and aggressive marketing strategies, as outlined herein, Defendants have obtained a dominant share in the market for narcotic pain medications. Defendants have leveraged their dominant position in the market to charge more for OxyContin than they could have, but for the Defendants' deceptive trade practices and resulting dominant market share. Plaintiff and other Third-Party Payors have been injured by Defendants' practices because TPPS reimburse or pay, in whole or in part, for many or most prescriptions of OxyContin.

33.    The Defendant falsely and deceptively misrepresented or omitted a number of material facts concerning OxyContin drugs.

34.    Furthermore, through, among other things, its advertising campaigns, misleading communications with and concealment of information from the FDA, the medical community and the public, the Defendants continue to vigorously promote and advertise their drugs.

35.    Plaintiff and other third-party payors paid substantial amounts of money for the artificially high costs of filling OxyContin prescriptions.

36.    As a result of the Defendants' fraudulent concealment, the applicable statutes of limitations have been tolled as to all of Plaintiff's claims.

## CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a general class (the "Class") consisting of:

> All insurance providers and other third party payors, including self-funded plans, but excluding governmental entities, in the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for OxyContin from January 1, 1996 to the present time for indications not approved by the FDA. For purposes of the Class definition, individuals and entities "purchased" OxyContin if they paid all or part of the purchase price.

38.    Excluded from the Class are: (i) all present and former authorized agents and spouses of such authorized agents of Defendants; and (ii) all present and former employees and spouses of such employees of Defendants.

39.    Representative Plaintiff and the Class seek a refund or reimbursement of all amounts they have paid to or on behalf of themselves or their members for the purchase of OxyContin; prescription costs incurred as a proximate result of their members ingesting OxyContin; and, all other ascertainable economic losses and such other relief as the Representative Plaintiff and the Class are entitled to, including treble damages, and reasonable attorneys fees and costs.

40.    The proposed Class is sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member.  Also, the proposed Class consists of thousands of members, and therefore, is so numerous that joinder is impractical.

41.    Representative Plaintiff is a member of the class it seeks to represent. Representative Plaintiff's claims are typical of the claims of the Class because the Representative Plaintiff, like all Class members, paid for and/or reimbursed the cost of Oxycontin for uses not approved by the FDA.

42.    There are questions of law and fact common to the Class which include, but are not limited to:

a.    Whether OxyContin is medically necessary for uses not approved by the FDA;

b.    Whether Defendants engaged in a fraudulent and/or deceptive nationwide scheme of improperly marketing and selling OxyContin for conditions for which it is not safe or medically efficacious;

c.    Whether Defendants engaged in a fraudulent and/or deceptive nationwide scheme of improperly marketing and selling OxyContin to treat conditions for which the drug was not approved by the FDA;

d.    Whether Defendants developed and engaged in a uniform, national marketing strategy which failed to set forth material facts regarding the use of OxyContin;

e.    Whether Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information allowed them to maintain an artificially higher price for OxyContin than they would have been able to, but for the dominant market share of OxyContin;

f.    Whether Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information caused Plaintiff and the Class to pay more for each prescription of OxyContin than they otherwise would have, if Defendants had not engaged in the deceptive conduct alleged herein;

g.    Whether, through Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information as alleged herein, Defendants unjustly retained a benefit to the detriment of Plaintiff and the Class;

11

h.    Whether it was the policy and practice of Defendants to prepare, fund and publish materials which contained false information and misrepresentations regarding off-label uses for OxyContin;

i.    Whether Defendants developed and carried out a uniform national pattern of conduct whereby physicians, consumers and third-party payors were duped into believing the off-label uses promoted by Defendants were approved by the FDA;

j.    Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity with the intent to defraud Plaintiffs and Class Members;

k.    Whether Defendants knew or should have known that OxyContin was not approved by the FDA for purposes other than for the treatment of severe, chronic pain;

l.    Whether Defendants intentionally misrepresented the intended and approved uses of OxyContin through employees and "medical liaisons" employed to promote off-label uses for OxyContin;

m.    Whether Defendants coached or instructed physicians how to conceal the off-label nature of OxyContin prescriptions on claim forms submitted by or to Plaintiffs and members of the Class;

n.    Whether Defendants knew or were reckless in not knowing the nature and condition of the products sold to the consuming public;

o.    Whether Defendants embarked on an illegal scheme to provide kickbacks to physicians prescribing large amounts of OxyContin for off-label purposes to consumers;

p.    Whether Defendants recklessly and/or intentionally, concealed the intended use of OxyContin from Plaintiff and members of the Class;

q.    Whether Defendants recklessly and/or intentionally made false statements to physicians and pharmacists concerning the efficacy and safety of OxyContin;

r.    Whether Defendants coached or instructed physicians how to conceal the off-label nature of OxyContin prescriptions on claim forms submitted by or to Plaintiffs and members of the Class;

s.    Whether Defendants engaged in a pattern or practice that directly caused Plaintiff and Class Members to pay for OxyContin prescriptions that were not for medically necessary uses;

12

t.     Whether Defendants engaged in a pattern and practice that directly caused Plaintiffs and Class Members to pay for OxyContin prescriptions that were for non-FDA approved uses;

u.     Whether Defendants are liable to Plaintiff and the Class Members for damages for conduct actionable under the New Jersey Consumer Fraud Act;

v.     Whether Defendants are liable to Plaintiff and Class Members for damages for conduct actionable as common law fraud;

w.     Whether Defendants' conduct unjustly enriched themselves at the expense of Plaintiff and the Class;

x.     Whether Plaintiff and Class members are entitled to compensatory and punitive damages, and the amount of such damages;

y.     Whether Plaintiff and Class members are entitled to equitable, declaratory and injunctive relief; and

z.     Whether Plaintiff and Class members are entitled to attorneys' fees.

43.    These common issues of law and fact predominate over individual issues pertaining to individual Class members and class certification is a superior method of resolving those claims.

44.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is a member of the Class and is willing to serve as a representative of the Class. Plaintiff has retained counsel with substantial experience in prosecuting nationwide complex and third-party payor class actions. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class. Neither Plaintiffs nor Plaintiff's counsel have any interests adverse to those of the Class.

45.    Class certification pursuant to F.R.C.P. 23(b)(2) is appropriate because Defendants' course of dealing with members of the Class adversely affects all members of the Class, thereby making appropriate final and injunctive relief corresponding to declaratory relief

with respect to the Class as a whole, whereby Defendants would be compelled to cease such course of dealing.

46.    Class certification pursuant to F.R.C.P. 23(b)(3) is appropriate because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy and the questions of law or fact common to the members of the Class predominate over any questions affecting only individual Class members. Moreover, the damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the litigation needed to address Defendants' conduct. Further, it would be virtually impossible for the members of the Class individually to effectively redress the wrongs that they have individually suffered. Even if Class members themselves could afford such individual litigation, the court system could not, given the size of the Class. In addition, individualized litigation increases the delay and expense to all parties and to the court system. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, class litigation presents far fewer management difficulties, allows adjudication of claims that might otherwise go unaddressed because of the expense of bringing individual litigation, and provides the benefits of uniform adjudication, economies of scale, and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**_N.J.S.A. § 56:8-1 et seq._**
**(Knowing Concealment, Suppression, or Omission of Material Facts)**

47.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

48.    This claim is asserted by Plaintiffs on their own behalf and on behalf of all other similarly situated members of the Class against Defendants.

49.    The unfair and deceptive acts and practices of Defendants have directly, foreseeable, and proximately caused or will cause damages and injury to Plaintiffs and the members of the Class.

50.    The actions and failures to act of Defendants, including the false and misleading representations and omissions of material facts regarding OxyContin, and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts in connection with the sale of merchandise of Defendants in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

51.    Physicians relied upon Defendants' misrepresentations and omissions in prescribing OxyContin for non-approved uses. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class were damaged by paying for these prescriptions.

52.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit.

## SECOND CLAIM FOR RELIEF
## UNJUST ENRICHMENT

53.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

54.    This claim is asserted by Plaintiffs on their own behalf and on behalf of all other similarly situated members of the Class against Defendants.

15

55.    As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from payments Plaintiffs and the Class made for OxyContin.

56.    In exchange for the payments they made for OxyContin, and at the time they made these payments, Plaintiffs and the Class expected that the drug was a safe and medically effective treatment for the condition, illness, disease, disorder, or symptom for which it was prescribed.

57.    Defendants have voluntarily accepted and retained these payments, with full Knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the Class paid for OxyContin when they otherwise would not have done so. The failure of Defendants to provide Plaintiffs and the Class with the remuneration they expected enriched Defendants unjustly.

58.    Plaintiffs and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## THIRD CLAIM FOR RELIEF
## COMMON LAW FRAUD

59.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

60.    This claim is asserted by Plaintiffs on their own behalf and on behalf of all other similarly situated members of the Class against Defendants.

61.    Defendants made misrepresentations and omissions of facts material to Plaintiffs' and Class member's decisions to purchase OxyContin by, inter alia, (a) deliberately misrepresenting the uses for which OxyContin was safe and effective so that Plaintiffs and

members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (b) providing or publishing or causing to have provided or published presentations and materials containing false and/or misleading information upon which physicians, Plaintiffs, and members of the Class relied upon when choosing to prescribe or pay for OxyContin; and (c) actively concealing, and causing others to conceal, information about the true safety and efficacy of OxyContin to treat conditions for which it had not been approved by the FDA.

62.     Defendants knew at the time that they made these misrepresentations that they were false or that Defendants had failed to disclose facts they were obligated to disclose in order to make their other representations not misleading. Defendants were aware that plaintiff's fiduciaries and agents, their physicians, would rely on these misrepresentations, and that such representations were material in the decision to prescribe or purchase OxyContin.

63.     Plaintiff and the Class reasonably relied upon Defendants' misrepresentations and omissions of material fact. Plaintiffs and the Class had no reason to doubt the veracity or scientific validity of the information Defendants promoted through their marketing and sales strategies.

64.     Defendants' misrepresentations and omissions of material fact directly and proximately caused Plaintiffs' and the Class' damages.

65.     By virtue of the fraud they perpetrated on Plaintiffs and the Class, Defendants are jointly and severally liable to Plaintiffs and the Class for all damages Plaintiffs and the Class have sustained, plus punitive damages, plus the cost of this suit, including attorneys' fees.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

a.  declaring that this action is a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate class or classes, finding that plaintiff and its counsel are proper representatives of the classes; appointing NMUFCW as the Class Representative, and appointing the undersigned counsel of record as Class Counsel;

b.  requiring defendant to refund and make restitution of all monies acquired from the sale of OxyContin to Plaintiff and members of the Class;

c.  on Plaintiff's and the Class's New Jersey Consumer Fraud Act claim, compensatory damages, three times the damages Plaintiffs and the Class have sustained as a result of Defendants' conduct, such amount to be determined at trial, plus Plaintiffs' costs in this suit, including reasonable attorneys' fees;

d.  on Plaintiff's and the Class's common law fraud claim, compensatory damages, punitive damages, such amounts to be determined at trial, plus Plaintiff's costs in this suit, including all reasonable attorneys' fees;

e.  on Plaintiff's and the Class's claim for unjust enrichment, recovery in the amount of Plaintiff's and the Class's payment for OxyContin, such amount to be determined at trial, plus Plaintiff's costs in this suit, including all reasonable attorneys' fees;

f.  awarding Plaintiff and members of the Class statutory damages as permitted, including any applicable exemplary damages;

g.  awarding Plaintiff and members of the Class prejudgment interest;

h.  awarding Plaintiffs and the Class other appropriate equitable relief;

i.      awarding Plaintiffs and the Class restitution and/or disgorgement and other equitable relief as the Court deems appropriate;

j.      awarding Plaintiff and the Class their costs and expenses in this litigation, including, but not limited to, expert fees and reasonable attorneys' fees; and

k.      awarding Plaintiff and members of the Class such other and further relief as may be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated:  January 17, 2006.

SEEGER WEISS LLP

By:_____
        Christopher A. Seeger (CS-4880)
        One William Street
        New York, NY 10004
        Ph: (212) 584-0700
        Fax: (212) 584-0799

        JAMES R. DUGAN, II (La. Bar No. 24785)
        DOUGLAS R. PLYMALE (La. Bar No. 28409)
        DUGAN & BROWNE PLC
        650 Poydras Street, Suite 2150
        New Orleans, Louisiana 70130
        Telephone: (504) 648-0180
        Facsimile: (504) 648-0181

        Shane Youtz
        YOUTZ AND VALDEZ, PC
        420 Central SW, Suite 210
        Albuquerque, New Mexico 87102
        Telephone: (505) 244-1200
        Fax: (505) 244-9700

Art Sadin
SADIN LAW FIRM
1104 S. Friendswood Dr., Suite A
Friendswood, Texas  77546
Telephone:    (281) 648-7711
Facsimile:     (281) 648-7799

Stephen B. Murray, Sr. (La. Bar No. 9858)
Stephen B. Murray, Jr. (La. Bar No. 23877)
MURRAY LAW FIRM, PLC
909 Poydras Street, Suite 2550
New Orleans, Louisiana 70112
Telephone: (504) 525-8100
Fax:(504) 584-5249

**Of COUNSEL**