# EXHIBIT 10



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

NEW MEXICO UNITED FOOD AND
COMMERCIAL WORKERS UNION'S AND
EMPLOYERS' HEALTH AND WELFARE
TRUST FUND, on behalf of itself
and all others similarly situated,

              Plaintiff,

              v.

PURDUE PHARMA L.P.,
PURDUE PHARMA, INC.,
THE PURDUE FREDERICK COMPANY, INC.
d/b/a THE PURDUE FREDERICK COMPANY,
P.F. LABORATORIES, INC.,
ABBOTT LABORATORIES,
ABBOTT LABORATORIES, INC.,
MICHAEL FRIEDMAN, HOWARD R. UDELL,
PAUL D. GOLDENHEIM, JOHN DOE Nos. 1
through 20, and JANE DOE Nos. 1 through 20,

              Defendants.

-------------------------------------------------------------x

## 07 CV 6916

Civil Action No. _____

2007 AUG -1  PM 2: 37

U.S. DISTRICT COURT
S.D. OF N.Y.
FILED

## CLASS ACTION COMPLAINT

    Plaintiff, New Mexico United Food and Commercial Workers Union's and Employers'

Health and Welfare Trust Fund ("Plaintiff" or "NMUFCW"), by and through undersigned

counsel, on behalf of itself and on behalf of all other similarly situated members of the Plaintiff

Class, in support of its Class Action Complaint against Purdue Pharma L.P., Purdue Pharma,

Inc., The Purdue Frederick Company, Inc. d/b/a The Frederick Company, P.F. Laboratories, Inc.,

Abbott Laboratories, Abbott Laboratories, Inc., Michael Friedman, Howard R. Udell, Paul D.

Goldenheim, John Doe Nos. 1 through 20, and Jane Doe Nos. 1 through 20, based on personal

knowledge as to facts pertaining to itself, and upon information and belief, as per its attorneys'

investigations, as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.      From 1995 through at least the filing of this Complaint, Defendants created and

implemented an unfair and deceptive scheme and conspiracy involving the "off-label" marketing,

promotion and sales of the prescription drug oxycodone hydrochloride, marketed, promoted and

sold as OxyContin® (hereinafter referred to as "OxyContin"), which scheme and conspiracy was

designed to increase substantially the prescription and sale of OxyContin, which had been

designed and approved for use only by terminal cancer patients and those suffering from

moderate to severe, chronic pain.  Defendants systematically, among themselves and with other

entities and individuals, created a pervasive, illegal system designed to enable Defendants to reap

unlawful profits by increasing the market share of OxyContin at the expense of consumers,

including Medicare patients, healthcare insurers, employers' health and welfare funds, like

NMUFCW, and others, who were forced to overpay substantial amounts of money for

OxyContin.

2.      Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on its own behalf and as a representative of a nationwide Class consisting of all

insurance providers and other third-party payors, including self-funded plans, but excluding

governmental entities, in the United States and its territories, who, for purposes other than resale,

purchased, reimbursed and/or paid for OxyContin.

3.      This is a class action for damages brought by the Plaintiff on behalf of a class of

third-party payors that provide health care benefits to their members and insureds, that have paid

-2-

and provided, and will continue to pay for or provide, OxyContin, as a direct and proximate

result of their members and insureds having been prescribed, supplied with, and taken the drug

OxyContin, as researched, designed, formulated, compounded, tested, manufactured, produced,

processed, assembled, inspected, labeled, packaged, distributed, marketed, promoted, advertised

for sale, prescribed or otherwise placed in the stream of interstate commerce by the Defendants.

This action seeks, among other relief, general and special damages and equitable relief, including

but not limited to recovery for prescription costs, restitution, refunds, and/or for equitable,

injunctive and declaratory relief against the Defendants.

      4.     As further described below, one corporate defendant has pled guilty to felony

charges under the Food, Drug and Cosmetic Act, respecting its misbranding of OxyContin with

the intent to defraud or mislead and the three individual defendants have pled guilty to the

misdemeanor charge of misbranding.  These guilty pleas and facts admitted in conjunction with

the settlement with the government concern certain conduct which is alleged herein, *i.e.*, that

Defendants deceptively marketed OxyContin by falsely claiming that it was less addictive, less

subject to abuse and less likely to cause withdrawal symptoms than other pain medications, when

there was no medical research to support these claims and without approval of the Food and

Drug Administration ("FDA") of these claims, which conduct is at the heart of the deceptive

marketing and sales scheme and conspiracy alleged herein.

## THE PARTIES

      5.     The Representative Plaintiff, New Mexico United Food and Commercial Workers

Union's and Employers' Health and Welfare Fund ("NMUFCW"), is a Taft-Hartley fund with its

principle place of business in Albuquerque, New Mexico.  Plaintiff, NMUFCW, has paid or

-3-

reimbursed eligible trust participants' prescription drug benefits for OxyContin and was injured by the conduct alleged herein.

6.     Defendant, Purdue Pharma L.P. (hereinafter, along with Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and P.F. Laboratories, Inc., referred to as the "Purdue Defendants" or "Purdue"), was and is a Delaware limited partnership with its principal place of business located on One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut. It is the successor in interest to The Purdue Pharma Company. At all times relevant herein Purdue Pharma, L.P. was and is in the business of designing, testing, manufacturing, labeling, marketing, advertising, promoting, distributing and/or selling OxyContin.

7.     Defendant, Purdue Pharma, Inc., was and is a New York corporation with its principal place of business located in Stamford, Connecticut. It is the general partner of Purdue Pharma L.P. At all times relevant herein Purdue Pharma, Inc. was and is the business of designing, testing, manufacturing, labeling, marketing, advertising, promoting, distributing and/or selling OxyContin.

8.     Defendant, The Purdue Frederick Company, Inc. d/b/a The Purdue Frederick Company, was and is a New York corporation with its principal place of business located in Stamford, Connecticut. At all times relevant herein, The Purdue Frederick Company, Inc. was and is in the business of designing, testing, manufacturing, labeling, marketing, advertising, promoting, distributing and/or selling OxyContin.

9.     Defendant, P.F. Laboratories, Inc. is a New Jersey corporation with its principal place of business located at 700 Union Boulevard, Totowa, New Jersey. At all times relevant herein, P.F. Laboratories, Inc. was and is in the business of designing, testing, manufacturing,

-4-

labeling, marketing, advertising, promoting, distributing and/or selling OxyContin. Specifically, P.F. Laboratories, at all relevant times, manufactured Oxycontin, conducted quality control tests, affixed labels provided to it by one of its associated companies through a third-party printer and delivered OxyContin on behalf of and at the direction of the associated company.

10.    At all times relevant hereto, one or more of the Purdue Defendants owned the patents covering OxyContin.

11.    Defendant Abbott Laboratories (hereinafter, along with Abbott Laboratories, Inc., referred to as the "Abbott Defendants" or "Abbott") was and is an Illinois corporation with its principal place of business located in Abbott Park, Illinois. At all times relevant herein, Abbott Laboratories was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, co-promoting, distributing and/or selling OxyContin.

12.    Defendant Abbott Laboratories, Inc. was and is a Delaware corporation with its principal place of business located in Abbott Park, Illinois. At all times relevant herein, Abbott Laboratories Inc. was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, co-promoting, distributing and/or selling OxyContin.

13.    At all times relevant herein, Abbott provided promotional assistance in the marketing of OxyContin in this District and throughout the United States, as per an agreement with Purdue, dated on or about January 1, 1996, and/or as per other contracts or arrangements.

14.    Defendant, Michael Friedman ("Friedman" or, hereinafter, along with Howard R. Udell and Paul D. Goldenheim, collectively referred to as the "Individual Defendants"), a resident of Weston, Connecticut, joined Purdue in 1985 as Vice President and Assistant to the President and Chairman. He was appointed Group Vice President in 1988, Executive Vice

President and Chief Operating Officer in 1999, and President and Chief Executive Officer in 2003.

15.    Howard R. Udell ("Udell"), a resident of Westport, Connecticut, joined Purdue in 1977 as General Counsel.  He was appointed Group Vice President and General Counsel in 1989, Executive Vice President and General Legal Counsel in 1999 and Executive Vice President and Chief Legal Officer in 2003.

16.    Paul D. Goldenheim ("Goldenheim"), a resident of Wilton, Connecticut, joined Purdue in 1985 as Medical Director. He was appointed Vice President and Medical Director in 1986, Vice President of Scientific and Medical Affairs and Executive Director of Purdue Frederick Research Center in 1988, Group Vice President of Scientific and Medical Affairs in 1989, Executive Vice President of Medical and Scientific Affairs in 1999,  Executive Vice President of Worldwide Research & Development in 2000 and Executive Vice President of Worldwide Research & Development and Chief Scientific Officer in 2003.  He left Purdue in 2004.

17.    John Doe Nos. 1 through 20 and Jane Doe Nos. 1 through 20 ("Does") are persons and/or entities that are or were complicit in, or actively participated in, the scheme and conspiracy alleged herein.  The true identities of Does are currently not known to Plaintiff. Plaintiff will seek to amend this complaint after the actual identities of Does are discovered.

## <u>JURISDICTION</u>

18.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and pursuant to 18 U.S.C. § 1364(c), because this action alleges violations of the Racketeer Influenced and Corrupt

-6-

Organizations Act ("RICO"). This Court also has jurisdiction over the subject matter of this action pursuant the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) (2), because the amount in controversy exceeds $5 million, exclusive of interests and costs, and the members of the putative Plaintiff Class are citizens of states different from those of Defendants and there are more than one hundred (100) Class Members. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

19.    This Court has personal jurisdiction over the parties because certain Purdue Defendants are citizens of this state, and all Defendants conduct substantial business in this State, have had systematic and continuous contacts with this State, and have agents and representatives which can be found in this state.

20.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 and 18 U.S.C. § 1965 because a substantial part of the acts and omissions at issue in this case occurred within the geographical boundaries of this Federal District and because the Purdue Defendants are citizens of this State.

## FACTUAL ALLEGATIONS

21.    OxyContin is a controlled release oral formulation of the narcotic pharmaceutical, oxycodone hydrochloride, an opioid agonist. OxyContin was approved for use on December 12, 1995 in the management and treatment of patients with moderate to severe pain who are expected to need continuous opioids for an extended period of time.

22.    The Purdue Defendants developed and patented OxyContin, which was launched in December, 1995.

-7-

23.     In order to assist in the introduction into the market and promotion of OxyContin, on or about January 1, 1996, Purdue entered into a Co-Promotion Agreement with Abbott.

24.     OxyContin was initially available in 10 mg, 20 mg, and 40 mg, tablet strengths. In 1997, OxyContin 80 mg tablets became available and in July, 2000, 160 mg tablets became available.

25.     OxyContin is a federally controlled substance pursuant to Schedule II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* As such, (1) it has a high and foreseeable potential for abuse, (2) its medical use in the United States is severely restricted; and (3) the abuse of the drug may lead to severe psychological or physical dependence. Because OxyContin is a Schedule II drug, a prescription cannot even be called in to the pharmacy by the patient's doctor; rather, the patient must hand-carry the written prescription to a pharmacy.

26.     OxyContin tablets are manufactured with a controlled-release or time-release formulation. OxyContin tablets are taken every twelve (12) hours, as opposed to short-acting pain medications which must be taken every three to six hours. However, because of its controlled-release or time-release formulation, OxyContin contains more milligrams of oxycodone than any other drug on the market containing oxycodone. For example, the 160 mg form of OxyContin contains as much of the active ingredient oxycodone as thirty-two (32) 5 mg tablets of Percocet.

27.     At various times relevant herein, Defendants developed, designed, tested, manufactured, marketed, advertised, promoted, distributed and/or sold OxyContin for the management of pain.

-8-

28.     Following the launch of the drug in December, 1995, sales quickly skyrocketed. By the year 2000, just four (4) years after its introduction into the marketplace, OxyContin ranked 36th in sales in the United States of all prescription medications, with a total sales volume of over six hundred million dollars ($600,000,000), resulting from over three million (3,000,000) prescriptions that year.  Eventually, by 2003, sales of Oxycontin exceeded one billion dollars ($1,000,000,000) with the number of prescriptions written that year in excess of six million (6,000,000).

29.     The enormous sales volume of OxyContin was due primarily to Defendants' aggressive, nationwide and uniform strategy aimed at physicians, hospitals, pharmacists, and patients.  Defendants developed this marketing and advertising strategy with the intent that physicians would prescribe OxyContin, pharmacists would fill prescriptions for OxyContin, patients would ask their doctors to prescribe OxyContin and hospitals and third-party payors would place OxyContin on their formularies.  However, that marketing strategy, which was heavily coercive, misrepresented the appropriate uses for OxyContin and failed to adequately disclose and discuss the safety issues and possible adverse effects of OxyContin use.

30.     Defendants used two key promotional messages for primary physicians and other high prescribers:

    a.     Telling them to prescribe OxyContin for your pain patients as the drug "to start with and to stay with;" and

    b.     Characterizing the contrast between dosing with other opioid pain relievers with OxyContin as "the hard way versus the easy way" to dose since OxyContin's twice-a-day dosing for patients was more convenient.

-9-

31.    From the outset of the OxyContin campaign, despite the scope of uses respecting the FDA approval, Defendants promoted the drug to physicians for non-cancer pain caused by arthritis, injuries and other chronic diseases in addition to cancer.

32.    In fact, on May 11, 2000, the FDA issued a warning letter to Purdue Pharma ordering it to cease the use of a standard Purdue Pharma advertisement that stated and/or implied that OxyContin could be used to treat arthritis pain without first using milder drugs.  The FDA letter stated, in pertinent part:

> You present the headline, "Proven Effective in Arthritis Pain" on the first page of the journal ad, followed by the results of a study conducted on 133 patients with moderate to severe osteoarthritis on the second page.  This presentation suggests that OxyContin has been studied in all types of arthritis and can be used as a first-line therapy for the treatment of osteoarthritis... You should immediately discontinue the use of this journal advertisement and all other promotional materials for OxyContin that contain the same or similar claims or presentations.

(Purdue later withdrew the advertisement in question.)

33.    Similarly, Defendants' sales representatives were sent by Defendants into the medical community with highly coercive but uniform, marketing tactics and advertising/promotional materials developed by Defendants with the intent that physicians would prescribe OxyContin and pharmacists would fill these prescriptions for OxyContin.  Upon information and belief, Defendants and their employees or agents represented to physicians and pharmacies that OxyContin "was safe enough to treat short-term pain", that it should be prescribed to elderly women with osteoarthritis, and that it should be prescribed "for everything" including low back pain.

-10-

34.    Defendants sent and/or sales representatives delivered to doctors 14,000 promotional videotapes in 1999 that minimized OxyContin's risks and made unsubstantiated claims. This version of the videotape was never submitted to the FDA for approval. Another version of the marketing videotape, 12,000 copies of which was distributed beginning in February 2001, were submitted to the FDA for approval and determined also to minimize OxyContin's risks and to make unsubstantiated claims about the drug.

35.    In addition, Defendants "courted" prescribers by paying their transportation, lodging and meal costs at national conferences to discuss pain management. At these conferences, Defendants would then recruit prescribers and pay them fees to speak to others at the more than 20,000 pain-related educational programs sponsored by Defendants around the United States. During the first 5 years that OxyContin was marketed, Purdue conducted over 40 national pain management and speaker training conferences, attended by over 5,000 physicians, pharmacists and nurses, usually in resort locations, such as Boca Raton, Florida and Scottsdale, Arizona. At those national conferences and local programs, Defendants continued their nationwide, uniform marketing strategy of misrepresentation by marketing OxyContin as a safe and effective way in which to treat all types of pain, including minor pain. Despite their knowledge to the contrary, Defendants failed to provide the complete safety and risk information, much less mention the fact that OxyContin was intended only to treat moderate to severe pain, or that it had an extraordinary potential for abuse.

36.    Moreover, despite knowing the OxyContin could only be prescribed by a physician, Defendants pursued their uniform, nationwide marketing strategy of misrepresentation through marketing tactics aimed directly at consumers. As an example of that nationwide

-11-

strategy, Defendants financed an Internet site called "Partners Against Pain." Through this public relations website, Defendants continued their national marketing strategy, promoting OxyContin directly to members of the public. At least one purpose of this website was to induce consumers to purchase OxyContin. Despite their knowledge to the contrary, Defendants failed to provide consumers with complete safety and risk information, much less mention the fact that OxyContin was intended only to treat moderate to severe pain, or that it had an extraordinary potential for abuse.

37.    As another means of marketing directly to consumers, Defendants used patient starter coupons for OxyContin to provide patients with a free limited-time prescription. Unlike patient assistance programs, which provide free prescriptions to patients in financial need, a coupon program is intended to enable a patient, regardless of financial means, to try a new drug through a one-time free prescription. Defendants' sales representatives distributed the coupons to physicians who decided which of their patients would receive the coupons, which coupons the patients would then redeem for free prescriptions through participating pharmacies. In 1998 and 1999, each sales representative was given 25 coupons, redeemable for a 30-day supply. In 2000, each representative was provided 90 coupons for a 7-day supply, and in 2001, each was given 10 coupons for a 7-day supply. By the time of the label change in 2001, approximately 34,000 coupons had been redeemed nationally.

38.    At all times relevant herein, the national marketing strategy used by Defendants, as outlined above, was intended to create a market demand for OxyContin, to induce the purchase and sale of OxyContin tablets and to allow Defendants to charge more for OxyContin than they otherwise would have been able to charge, absent the market penetration of OxyContin.

-12-

39.     Moreover, through their aggressive, nationwide and uniform marketing campaigns, Defendants encouraged the inappropriate prescription of OxyContin in order to raise their share of the pharmaceutical "pain management" market exponentially in a very short time.

40.     As a result of their nationally developed, aggressive marketing tactics, Defendants achieved their intended purpose.  OxyContin rapidly became one of the most widely used painkillers in the United States.

41.     Aware that members of the public (consumers) could obtain OxyContin from those pharmacists in Mexico without a prescription, Defendants were facilitating the inappropriate use of OxyContin by supplying pharmacists in Mexico with OxyContin, in unusually large amounts and at substantial discounts.

42.     Upon information and belief, OxyContin can be, was and is being abused by crushing and/or dissolving the product, which creates a feeling of euphoria similar to that experienced when taking heroin.  This type of use allows persons to obtain the full effect of an entire dose of OxyContin immediately, rather than over the intended, time-release period.

43.     Despite their awareness of the abuse of OxyContin by crushing and/or dissolving it to bypass the time-release mechanism, Defendants failed to take any steps to reformulate OxyContin to prevent its abuse in this manner.

44.     Specifically, Defendants failed to incorporate into the product formulation any feature that would have reduced the risk of bypass, diversion and abuse, all contributing to high risk and misuse and/or addiction.  Accordingly, as the use of OxyContin by intended consumers skyrocketed, so did the numbers of people who were being put at risk of misuse and/or addiction to the drug.

-13-

45.     In early 2001, the use and abuse of OxyContin engendered by Defendants'
uniform, nationwide marketing practices and overwhelming market share of the drug, grew to
such a level that Drug Enforcement Agency ("DEA") officials asked Purdue to limit distribution
of OxyContin to doctors who managed pain. This was the first time that the DEA had targeted a
specific brand of prescription drug to curb its misuse.

46.     By July 2001, the FDA required that its strongest warning for an FDA-approved
product be placed on OxyContin's label and package insert, the so-called "black box warning,"
stating that the drug is as potentially addictive as morphine.

47.     In August 2001, the Connecticut Attorney General's Office called for Purdue to
take action by completely overhauling and reforming its marketing and distribution of Oxycontin
to stem the abuse of the drug. Instead of reforming its marketing practices as suggested, Purdue
announced an intent to reformulate OxyContin with an anti-narcotic additive that would prevent
abuse of the drug. Purdue represented that, although it might take up to three years before the
drug could be prescribed by doctors, it had the "blueprints" to develop a formulation in which,
upon chewing or crushing of the tablet, a second drug would be activated that would
counteract/cancel the oxycodone and thus, eliminate its euphoric effects. However, Purdue
never did come up with this promised "smart pill".

48.     Despite Defendants' awareness of the rising tide of abuse of OxyContin in the
aforementioned ways, Defendants continued their aggressive, uniform, nationwide marketing
strategy for OxyContin, and failed to take appropriate measures to ensure that OxyContin was
prescribed only in appropriate circumstances.

-14-

49.   Ultimately, following an investigation by the United States Attorney's Office for the Western District of Virginia and the United States Department of Justice Office of Consumer Litigation, on May 10, 2007, the United States of America filed a criminal Information ("Information") in the United States District Court for the Western District of Virginia, in the matter of *United States v. The Purdue Frederick Company, Inc. d/b/a The Purdue Frederick Company, et al.*, No. 07-cr-00029-jpj (W.D. Va.). Purdue pled guilty and was convicted respecting Count One of the Information, to the felony charge of misbranding of a drug, with the intent to defraud or mislead in violation of Title 21, United States Codes, Sections 331(a) and 333(a)(2) and upon which the Purdue Defendants have agreed to pay over $600,000,000 (six hundred million dollars) in criminal fines and civil penalties. Purdue admitted to knowingly and fraudulently misbranding OxyContin as being less addictive, less subject to abuse and diversion and less likely to cause tolerance and withdrawal problems than other pain medications. The Plea Agreement and Attachments thereto, including the Information, between the United States and Purdue are incorporated herein by reference as if fully set forth herein.

50.   The Individual Defendants, Friedman, Udell and Goldenheim, pled guilty to, and were convicted of, the strict liability misdemeanor offense of misbranding a drug in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1) under Count Two of the Information. Collectively, the Individual Defendants agreed to pay in excess of $34,000,000 (thirty-four million dollars) in fines and penalties. The Plea Agreements between the United States and each of these Purdue executives are incorporated herein by reference as if fully set forth herein.

51.   The $600,000,000 which Purdue agreed to pay under the settlement also included over $59,000,000 to settle with the states, including, but, not limited to Arizona, Arkansas,

-15-

California, Connecticut, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin and the District of Columbia, respecting the states' Medicaid programs.

52.    Specifically, Purdue pled guilty to, "[i]n or about and between January 1996 and June 30, 2001," "with the intent to defraud or mislead, introduc[ing] and caus[ing] the introduction into interstate commerce of quantities of Oxycontin from various locations ... to various locations ..., which were misbranded within the meaning of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(a), in that the matters described in paragraphs 19 through 43 of the Introduction of th[e] Information constituted labeling within the meaning of 21 U.S.C. § 321(m) and were false and/or misleading.  All in violation of 21 U.S.C. §§ 331(a), 352(a) and 333(a)(2)." *See* Count One of Information, which is Attachment F to the Plea Agreement, at p. 15.

53.    According to the Plea and related documents, Purdue misbranded OxyContin in three specific ways:

a.    Purdue sales representatives falsely told health care providers that OxyContin had less euphoric effect and less abuse potential than short-acting opioids.  This message was disseminated, *inter alia*, through the use of graphs, designed by Purdue, that exaggerated the differences between blood plasma levels achieved by OxyContin as compared to the levels of other pain relief medications.  Sales representatives were trained to use such graphs during role-play training at Purdue's headquarters in Stamford, Connecticut.

b.    Purdue supervisors and employees drafted an article about a study of the use of OxyContin in osteoarthritis patients that was published in a medical journal on March 27, 2000.  On June 26, 2000, each sales representative was provided with copy of the article and a "marketing tip" that stated that the article was available for use in achieving sales success.  Sales representatives distributed copies of the article to health care providers to

-16-

falsely and/or misleadingly represent that patients taking OxyContin at doses below 60 mg per day could always be discontinued abruptly without withdrawal symptoms. The article also indicated that patients on such doses would not develop tolerance. The marketing tip that accompanied the article stated that one of twelve key points was: "There were 2 reports of withdrawal symptoms after patients abruptly stopped taking CR [controlled release] oxycodone at doses of 60 or 70 mg/day. Withdrawal syndrome was not reported as an adverse event during scheduled respites indicating that CR oxycodone at doses below 60 mg/day can be discontinued without tapering the dose if the patient condition so warrants." These marketing claims were made even though Purdue representatives were well aware of studies, reports and other information contrary to the representations they were making. Indeed, certain information was actively suppressed by Purdue.

c.    Purdue sales representatives, while promoting and marketing OxyContin, falsely told health care providers that the statement in the OxyContin package insert that "[d]elayed absorption, as provided by OxyContin tablets, is believed to reduce the abuse liability of the drug," meant that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, was less likely to be diverted than immediate-release opioids, and could be used to "weed out" addicts and drug seekers.

The statement was later amended to read: "[d]elayed absorption, as provided by OxyContin tablets, when used properly for the management of pain is believed to reduce the abuse liability of a drug." Nevertheless, Purdue continued to market OxyContin in the same manner as described above.

*See* Agreed Statement of Facts, which is Attachment B to the Plea Agreement.

54.    From January 1996 through June 30, 2001, as a result of Purdue's deceptive marketing tactics, Oxycontin produced $2.8 billion in profits for the Purdue Defendants. *See* Information, ¶ 6, at p. 2.

55.    Pursuant to the Plea Agreement, Purdue agreed, *inter alia*, to "accept responsibility for its conduct", and to "not deny that it committed the crime to which it has plead guilty." *See* Plea Agreement, ¶ 5, at p.7.

-17-

56.    As part of the Plea Agreement, Purdue entered into a Corporate Integrity

Agreement ("CIA") under which Purdue agreed to comply with all Federal health care program

requirements, including FDA regulations, in its marketing, promotional, advertising, labeling and

sales materials and to establish internal policies and procedures to insure compliance.  *See* CIA,

attached as Exhibit E to the Plea Agreement.

57.    In connection with guilty pleas, the United States Attorney for the Western

District of Virginia, John Brownlee, stated:

> Even in the face of warnings from health care professionals, the
> media, and members of its own sales force that OxyContin was
> being widely abused and causing harm to our citizens, Purdue,
> under the leadership of its top executives, continued to push a
> fraudulent marketing campaign that promoted Oxycontin as less
> addictive, less subject to abuse, and less likely to cause withdrawal.
> In the process, scores died as a result of OxyContin abuse and an
> even greater number of people became addicted to OxyContin; a
> drug that Purdue led many to believe was safer, less abusable, and
> less addictive than other pain medications on the market.

*See* Press Release from The United States Attorney's Office of the Western District of Virginia,

dated May 10, 2007, at www.usdoj.gov/usao/vaw/press_releases/purdue_frederick_

10may2007.html, which is incorporated herein by reference.

58.    Assistant Attorney General Peter D. Keisler further stated that "Purdue put its

desire to sell OxyContin above the interests of the public.  Purdue abused the drug approval

process which relies on drug manufacturers to be forthright in reporting clinical data and, instead,

misled physicians about the addiction and withdrawal issues involved with OxyContin." *Id.*

59.    The Inspector General for the U.S. Department of Health and Human Services,

Daniel R. Levinson, said: "Purdue's illegal sales and marketing practices concealed information

-18-

from patients and many health care providers regarding the potency and abuse potential of OxyContin for corporate profit." *Id.*

60.     Most aptly, the Inspector General for the U.S. Department of Labor commented as follows:

> Today's guilty pleas mark a significant milestone in the fight against corruption by company officials who seek to illegally enrich corporate profits at taxpayers' expense. These convictions demonstrate our steadfast resolve to investigate any individuals who would defraud Labor programs, such as the Office of Workers' Compensation Programs, by overcharging them."

*Id.*

61.     While the guilty plea pertains to conduct only through June 30, 2001 (the "black box warning" was implemented as of July 1, 2001), Plaintiff submits that Defendants' deceptive and aggressive marketing tactics continued.

62.     In fact, the FDA sent Purdue another Warning Letter in January 2003, which letter was directed to Mr. Friedman, who pled guilty to federal misbranding charges, along with Purdue. The seven-page letter included the following admonition:

> Your advertisements thus grossly overstate the safety profile of OxyContin by not referring in the body of the advertisements to serious, potentially fatal risks associated with OxyContin, thereby potentially leading to prescribing of the product based on inadequate consideration of risk. In addition, your journal advertisements fail to present in the body of the advertisements critical information regarding limitations on the indicated use of OxyContin, **thereby promoting OxyContin for a much broader range of patients with pain than are appropriate for the drug.** The combination in these advertisements of suggesting such a broad use of this drug to treat pain without disclosing the potential for abuse with the drug and the serious, potentially fatal risks associated with its use, is especially egregious and alarming in its potential impact on the public health.

(Emphasis added.)

-19-

63.    Less than a year prior, on February 12, 2002, Dr. Goldenheim, who also recently

pled guilty, in his testimony before the Senate Committee on Health, Education, Labor and

Pensions, acknowledging that "[p]erhaps the single most important tool to prevent abuse is

education" of prescribers, had assured the Committee members as follows:

> Purdue is scrupulous in training its field sales force to promote
> OxyContin **only for its approved indications**.... Rather than
> promoting aggressive marketing, Purdue's marketing practices
> focus on teaching doctors to only prescribe OxyContin in
> **appropriate** circumstances. Purdue managers monitor its field
> force for compliance with that policy.... Purdue's sales and
> marketing practices focus exclusively on the management of pain
> and the **proper** use of OxyContin in patients for whom such pain
> medication is **appropriate**. Our marketing program amounts to an
> extensive educational effort that teaches physicians how to make
> the best decisions for their patients with pain. Responsible
> physicians will only prescribe OxyContin if it is the right product
> for their patients with pain. ... An example of Purdue's efforts to
> promote only <u>appropriate</u> use of the drug in <u>appropriate</u> patients is
> the use of various medical guidelines that were incorporated in the
> original package insert and distributed by our field force .... The
> original package insert is quite clear regarding the **appropriate** use
> of OxyContin, and we were quite clear in promoting the use of
> OxyContin in a manner consistent with this package insert.

(Bolded emphasis added; underlined emphasis in original.)

64.    Yet, despite Dr. Goldenheim's assurances respecting Purdue's "appropriate"

marketing tactics and after being warned by the FDA in 2003 respecting Purdue's advertising, the

Report of the General Accounting Office ("GAO"), released in December 2003, described

deceptive and aggressive marketing tactics which were continuing after the label change. For

example, "[i]n early 2003, Purdue began distributing an OxyContin branded goniometer – a

range and motion measurement guide. According to DEA, Purdue's use of branded promotional

items to market OxyContin was unprecedented among Schedule II opioids, and was an indicator

-20-

of Purdue's aggressive and inappropriate marketing of OxyContin." *See* GAO Report entitled "Prescription Drugs: OxyContin Abuse and Diversion and Efforts To Address the Problem," dated December 2003, at p. 25.

65.     On July 20, 2007, The Honorable James P. Jones accepted the plea agreements of Purdue and the Individual Defendants and pronounced sentences, as set forth in the previously described in the Plea Agreements, which have been incorporated by reference. In addition to the fines and disgorgement of $19,000,000 (nineteen million dollars) by Friedman, $8,000,000 (eight million dollars) by Udell and $7,500,000 (seven million five hundred dollars) by Goldenheim, the Individual Defendants also were sentenced to three years probation and four hundred (400) hours of community service.

66.     Certain third-party payors sought to appear and be heard at the sentencing hearing in order to assert that the $130,000,000, which Purdue had agreed to pay in restitution in order to settle private civil claims related to OxyContin, was insufficient, since, as per Purdue, those funds already had been exhausted. While the court declined to reject Purdue's plea on the grounds that the restitution was insufficient because the court acknowledged that "the restitution process would unduly complicate and prolong the sentencing process," the court also acknowledged that "Purdue's liability for private claims is not capped by the plea agreements. Purdue agrees to pay at least $130 million to settle private claims, but no maximum limit is imposed." *See* Opinion and Order, dated July 23, 2007, in *United States v. The Purdue Frederick Company, Inc. d/b/a The Purdue Frederick Company, et al.*, No. 07-cr-00029-jpj (W.D. Va.).

67.     Additionally, while the guilty pleas pertain solely to the Purdue Defendants and the Individual Defendants, Plaintiff submits, upon information and belief, that, as Purdue's

-21-

chosen and retained co-promoter of OxyContin, the Abbott Defendants utilized the same

deceptive and aggressive marketing tactics as those utilized by Purdue.

68.     The Abbott Defendants co-promoted OxyContin pursuant to a Co-Promotion

Agreement entered into on or about January 1, 1996.

69.     The Co-Promotion Agreement called for Abbott to perform promotional efforts on

behalf of OxyContin.  These included sales presentations, maintenance of a sales force to

promote OxyContin and best efforts to obtain sales of the product.  Abbott's promotional efforts

were sales presentations to anesthesiologists, surgeons, hospitals, acute care facilities and

ambulatory care facilities.  Abbott was to provide incentives such as additional compensation or

prizes to its agents for achieving sales volume goals, and Purdue agreed to pay Abbott a

substantial commission on net sales.  The Co-Promotion Agreement includes a requirement that

Abbott seek to have hospital "purchasing personnel" list OxyContin on their institution's

"formulary."  *See Steadfast Ins. Co. v. The Purdue Frederick Co.*, No. X08CV020191697S,

2004 WL 2166258, at *5 (Conn. Super. Sept. 1, 2004).

70.     From 1996 through at least 2002, Abbott provided at least 300 sales

representatives under the Co-Promotion Agreement, who were dedicated to the promotion of

OxyContin. "  *See* GAO Report entitled "Prescription Drugs: OxyContin Abuse and Diversion

and Efforts To Address the Problem," dated December 2003, at p. 19.

71.     Abbott agreed to the use of its name and logo, along with Purdue's name and

logo, in materials promoting OxyContin, thereby lending its name and prestige to Purdue and

encouraging prescribers to assume that Abbott endorsed the use of OxyContin.

-22-

72.    As a result of Defendants' deceptive and aggressive marketing strategies, as outlined herein, Defendants have obtained a dominant share in the market for narcotic pain medications. Defendants have leveraged their dominant position in the market to charge more for OxyContin than they could have, but for the Defendants' deceptive trade practices and resulting dominant market share. Plaintiff and the Class Members have been injured by Defendants' practices because these entities reimburse or pay, in whole or in part, for many or most prescriptions of OxyContin.

73.    The Defendants falsely and deceptively misrepresented or omitted a number of material facts concerning OxyContin.

74.    Furthermore, through, among other things, advertising campaigns, misleading communications with and concealment of information from the FDA, the medical community and the public, the Defendants continued to vigorously promote and advertise their drugs.

75.    Plaintiff and other third-party payors paid substantial amounts of money for the artificially high costs of filling OxyContin prescriptions.

76.    As a result of the Defendants' fraudulent concealment, the applicable statutes of limitations have been tolled as to all claims.

## CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class consisting of:

> All insurance providers and other third party payors, including self-funded plans, but excluding governmental entities, in the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for OxyContin from January 1, 1996 to the present. For purposes of the Class definition, entities

-23-

"purchased, reimbursed and/or paid" for OxyContin if they paid all or part of the purchase price.

78.    Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest and their employees, legal representatives, officers, directors, assignees, and successors and the spouses of those individuals.

79.    Plaintiff and the Class Members seek a refund or reimbursement of all amounts they have paid on behalf of themselves or their members for the purchase of OxyContin; prescription costs incurred as a proximate result of their members ingesting OxyContin; and, all other ascertainable economic losses and such other relief to which the Plaintiff and the Class are entitled, including treble damages, and reasonable attorneys' fees and costs.

80.    The proposed Class is sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member.  Also, the proposed Class consists of thousands of members, and therefore, is so numerous that joinder is impractical.

81.    Plaintiff is a member of the Class it seeks to represent.  Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all Class Members, paid for and/or reimbursed the cost of OxyContin.

82.    There are questions of law and fact common to the Class which include, but are not limited to:

        a.    Whether OxyContin is medically necessary for uses not approved by the FDA;

-24-

b.    Whether Defendants engaged in a deceptive nationwide scheme of improperly and aggressively marketing and selling OxyContin for conditions for which it is not safe or medically efficacious;

c.    Whether Defendants engaged in a deceptive nationwide scheme of improperly and aggressively marketing and selling OxyContin to treat conditions for which the drug was not approved by the FDA;

d.    Whether Defendants developed and engaged in a uniform, national marketing strategy which failed to set forth material facts regarding the use of OxyContin;

e.    Whether Defendants' deceptive acts or practices, which included their uniform, deceptive marketing strategies and/or concealment of material information allowed them to maintain an artificially higher price for OxyContin than they would have been able to, but for the dominant market share of OxyContin;

f.    Whether Defendants' deceptive acts or practices, which included their uniform, deceptive marketing strategies and/or concealment of material information caused Plaintiff and the Class to pay more for each prescription of OxyContin than they otherwise would have, if Defendants had not engaged in the deceptive conduct alleged herein;

g.    Whether Defendants' deceptive acts or practices, which included their uniform, deceptive marketing strategies and/or concealment of material

-25-

information caused Plaintiff and the Class to pay for prescriptions of OxyContin in connection with uses not approved by the FDA;

h.     Whether Defendants' deceptive acts or practices, which included their uniform, deceptive marketing strategies and/or concealment of material information, undertaken in the manner herein described, constituted mail fraud, wire fraud and/or the use of interstate facilities to conduct unlawful activity under RICO;

i.     Whether, through Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information as alleged herein, Defendants unjustly retained a benefit to the detriment of Plaintiff and the Class;

j.     Whether it was the policy and practice of Defendants to prepare, fund and publish materials which contained false information and misrepresentations regarding off-label uses for OxyContin;

k.     Whether Defendants developed and carried out a uniform national pattern of conduct whereby physicians, consumers and third-party payors were duped into believing the off-label uses promoted by Defendants were approved by the FDA;

l.     Whether Defendants engaged in a pattern of unfair and deceptive activity with the intent to deceive Plaintiff and Class Members;

-26-

m.  Whether Defendants knew or should have known that OxyContin was not approved by the FDA for purposes other than for the treatment of moderate to severe, chronic pain;

n.  Whether Defendants intentionally misrepresented the intended and approved uses of OxyContin through employees and "medical liaisons" employed to promote off-label uses for OxyContin;

o.  Whether Defendants coached or instructed physicians how to conceal the off-label nature of OxyContin prescriptions on claim forms submitted to Class Members;

p.  Whether Defendants knew or were reckless in not knowing the nature and condition of the products sold to the consuming public;

q.  Whether Defendants embarked on an illegal scheme to provide kickbacks to physicians prescribing large amounts of OxyContin for off-label purposes to consumers;

r.  Whether Defendants recklessly and/or intentionally, concealed the intended use of OxyContin from Plaintiff and members of the Class;

s.  Whether Defendants recklessly and/or intentionally made false statements to physicians and pharmacists concerning the efficacy and safety of OxyContin;

t.  Whether Defendants engaged in a pattern or practice that directly caused Plaintiff and Class Members to pay for OxyContin prescriptions that were not for medically necessary use;

-27-

u.    Whether Defendants engaged in a pattern and practice that directly caused Plaintiff and Class Members to pay for OxyContin prescriptions that were for non-FDA approved uses;

v.    Whether Defendants are liable to Plaintiff and the Class Members for damages for conduct actionable under RICO;

w.    Whether Defendants are liable to Plaintiff and the Class Members for damages under the various states consumer protection statutes;

x.    Whether Defendants' conduct unjustly enriched themselves at the expense of Plaintiff and the Class;

y.    Whether Plaintiff and Class Members are entitled to compensatory and punitive damages;

z.    Whether Plaintiff and Class Members are entitled to equitable, declaratory and injunctive relief, and;

aa.    Whether Plaintiff and Class Members are entitled to attorneys' fees.

83.    These common issues of law and fact predominate over individual issues pertaining to individual Class Members and class certification is a superior method of resolving these claims.

84.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is a member of the Class and is willing to serve as a representative of the Class. Plaintiff has retained counsel with substantial experience in prosecuting nationwide complex and third-party payor class actions.  Plaintiff and Plaintiff's counsel are committed to vigorously

-28-

prosecuting this action on behalf of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests adverse to those of the Class.

85.    Class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy and the questions of law or fact common to the members of the Class predominate over any questions affecting only individual Class Members. Moreover, the damages suffered by individual Class Members are small compared to the burden and expense of individual prosecution of the litigation needed to address Defendants' conduct. Further, it would be virtually impossible for the members of the Class individually to effectively redress the wrongs that they have individually suffered. Even if Class Members themselves could afford such individual litigation, the court system could not, given the size of the Class. In addition, individualized litigation increases the delay and expense to all parties and to the court system. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, class litigation presents far fewer management difficulties, allows adjudication of claims that might otherwise go unaddressed because of the expense of bringing individual litigation, and provides the benefits of uniform adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF 18 U.S.C. § 1962(c)

86.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

-29-

87.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise, the Off-Label Promotion Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

88.    The Off-Label Promotion Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of the Purdue Defendants, the Abbott Defendants, including their employees and agents, the Individual Defendants and the Does, who acted to promote OxyContin for off-label uses in contravention of FDA regulations.  The Off-Label Promotion Enterprise is an organization that functions as an ongoing organization and continuing unit.  The Off-Label Promotion Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity.  Each Defendant is a "person" distinct from the Off-Label Promotion Enterprise.

89.    Defendants created and maintained systematic links for a common purpose – to aid in marketing OxyContin for off-label uses.  Each of the participants in the Off-Label Promotion Enterprise received substantial revenue from the scheme to promote OxyContin for off-label uses.  Such revenue was exponentially greater than it would have been if OxyContin had been marketed appropriately.  All participants were aware of the named Defendants' control over the activities of the Off-Label Promotion Enterprise promoting OxyContin for off-label uses.  Additionally, each portion of the enterprise benefitted from the existence of the other parts.

90.    The Off-Label Promotion Enterprise engaged in and affected interstate commerce, because, *inter alia,* it marketed, promoted, sold, distributed, or provided OxyContin to thousands of individuals and entities throughout the United States.

-30-

91.    The named Defendants have exerted control over the Off-Label Promotion Enterprise and management of the affairs of the Off-Label Promotion Enterprise.

92.    Defendants have conducted and participated in the affairs of the Off-Label Promotion Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct unlawful activity).

93.    Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications, including, but not limited to:

a.    marketing and advertising materials about the off-label uses of OxyContin for which the drug is not proven to be safe, medically efficacious, and useful, such materials being sent to doctors across the country;

b.    communications, including financial payments, with and among named Defendants and other participants, discussing and relating to the marketing materials and/or placement of advertisements in journals misrepresenting appropriate uses for OxyContin;

c.    communications with and among named Defendants and other participants, including physicians, that fraudulently misrepresented that OxyContin was clinically proven to be safe, medically efficacious, and useful for off-label purposes;

d.    communications with patients and Class Members, including Plaintiff, inducing payments for OxyContin to be made based upon

-31-

misrepresentations concerning the safety, efficacy, and usefulness of OxyContin; and

e.    receiving the proceeds of Defendants' improper scheme.

94.    In addition, Defendants' corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, sales representatives and others around the country in furtherance of Defendants' scheme.

95.    Defendants' pattern of racketeering activity includes acts indictable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. Defendants' fraudulent scheme and conspiracy consisted of *inter alia*: deliberately misrepresenting the uses for which OxyContin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective, actively concealing, and causing others to conceal, information about the true safety and efficacy of OxyContin to treat conditions for which it had not been approved by the FDA.

96.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depended on the honesty and integrity of Defendants in representing the medical efficacy of OxyContin and its appropriate uses. It would be impractical and unduly expensive for the Class Members to perform their own clinical trials or to assemble all known medical evidence related to OxyContin's uses. Class Members rely upon federal law obligating Defendants to provide fair and balanced information about their drug products and reasonably presume that when marketing, promoting, advertising and selling OxyContin, that such was done in compliance with Defendants' obligations under federal law.

-32-

97.    Defendants' scheme was calculated to ensure that Plaintiff and the Class Members would pay for OxyContin used to treat conditions which Defendants knew were not necessarily treatable with OxyContin, particularly in light of the safety risks OxyContin poses.

98.    The conduct of the Off-Label Promotion Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decision in connection with the Off-Label Promotion Enterprise routinely to conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

99.    The above described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiff and the Class Members.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the Class.  Defendants' racketeering activities were part of their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

100.    Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made millions of dollars in payments for OxyContin that they would not have made had Defendants not engaged in their pattern of racketeering activity.

101.    The injuries to Plaintiff and members of Class were directly and proximately caused by Defendants' racketeering activity as described above.

-33-

102.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

## COUNT II:
## VIOLATION OF 18 U.S.C. § 1962(d)

103.    Plaintiff incorporates by reference all proceeding paragraphs as if fully set forth herein.

104.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

105.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of affairs of the Off-Label Promotion Enterprise described previously through a pattern of racketeering activity.

106.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and the Class.

107.    The nature of the above-described Defendants' and their co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

-34-

108.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962 (c), Plaintiff and the Class have been and are continuing to be injured in their business or property as set forth more fully above.

109.    Defendants sought to and have engaged in the commission of the following overt acts, including the following unlawful racketeering predicate acts:

    a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

    b.    Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

    c.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

    d.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

110.    Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made millions of dollars in payments for OxyContin that they would not have made had Defendants not conspired to violate 18 U.S.C. § 1962(c).

111.    The injuries of Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

112.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendant is liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the costs of this suit, including reasonable attorney's fees.

-35-

## COUNT III:
## VIOLATIONS OF STATE CONSUMER PROTECTION STATUES

113.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114.     Defendants engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the state consumer protection statutes listed below when they employed deceptive and aggressive marketing tactics described herein.  As a direct result of Defendants' deceptive, unfair, and unconscionable conduct, Plaintiff and members of the Class were injured in that they paid millions of dollars for OxyContin that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

115.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8-19-1, *et seq.*

116.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*

117.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, *et seq.*

118.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, *et seq.*

119.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of COLO. REV. STAT. § 6-1-101, *et seq.*

120.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*

-36-

121.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*

122.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*

123.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, *et seq.*

124.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*

125.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*

126.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*

127.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in 815 ILL. COMP. STAT. 505/1, *et seq.*

128.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*

129.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*

130.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1401, *et seq.*

131.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, *et seq.*

-37-

132.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, *et seq.*

133.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, *et seq.*

134.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, *et seq.*

135.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, *et seq.*

136.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-1, *et seq.*

137.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*

138.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, *et seq.*

139.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*

140.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, *et seq.*

141.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, *et seq.*

142.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. STAT. ANN. § 56:8-1, *et seq.*

143.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*

144.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*

145.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*

146.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*

147.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OHIO REV. CODE ANN. § 1345.01, *et seq.*

148.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, *et seq.*

149.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*

150.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, *et seq.*

151.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, *et seq.*

152.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE ANN. § 39-5-10, *et seq.*

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, *et seq.*

-39-

154. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, *et seq.*

155. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

156. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, *et seq.*

157. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, *et seq.*

158. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, *et seq.*

159. Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*

160. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, *et seq.*

161. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

162. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*

163. The unfair and deceptive acts and practices of Defendants have directly, foreseeable, and proximately caused damages and injury to Plaintiff and the members of the Class.

-40-

164.     The actions and failures to act of Defendants, including the false and misleading representations and omissions of material facts regarding the side effects and the off-label use(s) for OxyContin and the above described course of deceptive conduct and fraudulent concealment, constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the marketing, promotion and sale of OxyContin by Defendants in violation of the consumer protection statutes listed above.

165.     Physicians relied upon Defendants' misrepresentations and omissions in prescribing OxyContin to patients.  Plaintiff and the members of the Class, as well as consumers, relied upon Defendants' misrepresentations and omissions in paying for OxyContin.  By reason of the unlawful acts engaged in by Defendants, Plaintiff and the Class have suffered ascertainable loss and damages.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class were damaged by paying for these prescriptions.

166.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class are entitle to compensatory damages, treble damages, attorneys' fees and costs of suit.

## COUNT IV:
## UNJUST ENRICHMENT

167.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

-41-

168.   As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefitted from payments Plaintiff and the Class made for OxyContin.

169.   In exchange for the payments they made for OxyContin, and at the time they made these payments, Plaintiff and the Class expected that the drug was a safe and medically effective treatment for the condition, illness, disease, disorder, or symptom for which it was prescribed.

170.   Defendants voluntarily have accepted and retained these payments, with full knowledge and awareness that, as a result of their wrongdoing, Plaintiff and the Class paid for OxyContin when they otherwise would not have done so. The failure of Defendants to provide Plaintiff and the Class with the remuneration they expected enriched Defendants unjustly.

171.   Plaintiff and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff and the Class demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

a.   declaring that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, establishing an appropriate class, finding that Plaintiff and its counsel are proper representatives of the class; appointing NMUFCW as the Class Representative, and appointing the undersigned counsel of record as Class Counsel;

-42-

b.     requiring Defendants to refund and make restitution of all monies acquired from the sale of OxyContin to Plaintiff and the Class;

c.     awarding damages on the RICO claims;

d.     awarding damages on the claims under the consumer protection statutes of the various states, respecting the compensatory damages Plaintiff and the Class have sustained as a result of Defendants' conduct, and punitive damages, such amounts to be determined at trial, plus Plaintiff's costs in this suit, including reasonable attorneys' fees;

e.     awarding recovery on Plaintiff's and the Class's claim for unjust enrichment, in the amount of payments for OxyContin, such amount to be determined at trial, plus Plaintiff's costs in this suit, including all reasonable attorneys' fees;

f.     awarding Plaintiff and the Class statutory damages as permitted, including any applicable exemplary damages;

g.     awarding Plaintiff and the Class prejudgment interest;

h.     awarding Plaintiff and the Class restitution and/or disgorgement and other equitable and/or injunctive relief as the Court deems appropriate;

i.     awarding Plaintiff and the Class their costs and expenses in this litigation, including, but not limited to, expert fees and reasonable attorneys' fees; and

j.     awarding Plaintiff and the Class such other and further relief as may be just and proper.

-43-

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all

issues so triable.

DATED: August 1, 2007

SEEGER WEISS LLP

BY: _____
Christopher A. Seeger (CS-4880)
One William Street
New York, NY   10004
Phone:  212-584-0700
Fax:  212-584-0799

Jonathan Shub
TerriAnne Benedetto
Seeger Weiss LP
1515 Market Street
Suite 1380
Philadelphia, PA 19102
Phone: 215-564-2300
Fax: 215-851-8029

Arnold Levin
Frederick S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: 215-592-1500
Fax: 215-592-4663

Stephen B. Murray, Sr.
Stephen B. Murray, Jr.
James R. Dugan, II
Douglas R. Plymale
Murray Law Firm
650 Poydras Street
Suite 2150
New Orleans, Louisiana 70130
Phone: 504-648-0180
Fax: 504-648-0181

Art Sadin
Sadin Law Firm, P.C.
121 Magnolia
Suite 102
Friendswood, Texas 77546
Phone: 281-648-7711
Fax: 281-648-7799

Shane Youtz
Youtz & Valdez, p.c.
900 Gold Avenue, S.W.
Albuquerque, NM 87102
Phone: 505-244-1200
Fax: 505-244-9700