# EXHIBIT B

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY
(618) 692-6240

ALLIED SERVICES DIVISION WELFARE FUND ON BEHALF OF ITSELF AN
PLAINTIFF

DATE: 10/05/2001

VS.

CASE No. 2001 L   001458

PURDUE PHARMA LP

DEFENDANT

DEFENDANT PURDUE PHARMA LP:

You are hereby summoned and required to file an answer in this case, or otherwise file your appearance, in the office of the Madison County Circuit Clerk, within 30 days after service of this summons, exclusive of the day of service. If you fail to do so, a judgment or decree by default may be taken against you for the relief prayed in the complaint.

This summons must be returned by the officer or other person to whom it was given for service, with endorsement thereon of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than 30 days after its date.

Witness: MATT MELUCCI the Clerk of said Circuit Court and the seal thereof, at Edwardsville, Illinois, this OCTOBER 5, 2001.

(SEAL)

MATT MELUCCI
CLERK OF THE CIRCUIT COURT

BY: _____
Deputy Clerk

==================================================================================
(Plaintiff's attorney or plaintiff if he is not represented by an attorney)

CARR,KOREIN,TILLERY,KUNIN,MONTROY,CATES,KATZ&GLASS
412 Missouri Ave.
E. St. Louis    IL 62201

Date of Service:_____, 20_____.
(To be inserted by officer on the copy left with the defendant or other person)

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY
(618) 692-6240

ALLIED SERVICES DIVISION WELFARE FUND ON BEHALF OF ITSELF AN
PLAINTIFF

DATE: 10/05/2001

VS.

CASE No. 2001 L 001458

PURDUE PHARMA LP

DEFENDANT

DEFENDANT PURDUE PHARMA LP:

You are hereby summoned and required to file an answer in this case, or otherwise file your appearance, in the office of the Madison County Circuit Clerk, within 30 days after service of this summons, exclusive of the day of service. If you fail to do so, a judgment or decree by default may be taken against you for the relief prayed in the complaint.

This summons must be returned by the officer or other person to whom it was given for service, with endorsement thereon of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than 30 days after its date.

Witness: MATT MELUCCI the Clerk of said Circuit Court and the seal thereof, at Edwardsville, Illinois, this OCTOBER 5, 2001.

MATT MELUCCI
CLERK OF THE CIRCUIT COURT

(SEAL)

BY: _____
Deputy Clerk

==========================================================================
(Plaintiff's attorney or plaintiff if he is not represented by an attorney)

CARR,KOREIN,TILLERY,KUNIN,MONTROY,CATES,KATZ&GLASS
412 Missouri Ave.
E. St. Louis    IL 62201

Date of Service:_____, 20_____.
(To be inserted by officer on the copy left with the defendant or other person)

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY
(618) 692-6240

ALLIED SERVICES DIVISION WELFARE FUND ON BEHALF OF ITSELF AN
PLAINTIFF

VS.

PURDUE PHARMA LP

DEFENDANT

DATE: 10/05/2001

CASE No. 2001 L 001458

DEFENDANT PURDUE PHARMA LP:

You are hereby summoned and required to file an answer in this case, or otherwise file your appearance, in the office of the Madison County Circuit Clerk, within 30 days after service of this summons, exclusive of the day of service. If you fail to do so, a judgment or decree by default may be taken against you for the relief prayed in the complaint.

This summons must be returned by the officer or other person to whom it was given for service, with endorsement thereon of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than 30 days after its date.

Witness: MATT MELUCCI the Clerk of said Circuit Court and the seal thereof, at Edwardsville, Illinois, this OCTOBER 5, 2001.

MATT MELUCCI
CLERK OF THE CIRCUIT COURT

(SEAL)

BY: _____
Deputy Clerk

================================================================================
(Plaintiff's attorney or plaintiff if he is not represented by an attorney)

CARR,KOREIN,TILLERY,KUNIN,MONTROY,CATES,KATZ&GLASS
412 Missouri Ave.
E. St. Louis    IL 62201


Date of Service:_____, 20_____.
(To be inserted by officer on the copy left with the defendant or other person)

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS



FILED
SEP 17 2001

CLERK OF CIRCUIT COURT #2
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | |
|---|---|
| ALLIED SERVICES DIVISION WELFARE FUND, on behalf of itself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PURDUE PHARMA, L.P., PURDUE PHARMA, INC., PURDUE FREDERICK COMPANY, ABBOTT LABORATORIES, and ABBOTT LABORATORIES, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 2001-L-1458 |

**AFFIDAVIT**

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF ST. CLAIR  )

Comes now Judy L. Cates, attorney for plaintiff in the above referenced litigation, and pursuant to Illinois Supreme Court Rule 222(b), states that the total of money damages sought in the above matter is in excess of Fifty Thousand Dollars ($50,000.00).

_____
JUDY L. CATES

Subscribed and sworn to before me, a Notary Public, on this 17th day of September, 2001.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
ROBIN McMANUS
Notary Public, State of Illinois
My Commission Exp. 04/16/2002

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS



FILED
SEP 17 2001

CLERK OF CIRCUIT COURT #2
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | |
|---|---|
| ALLIED SERVICES DIVISION WELFARE FUND, on behalf of itself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PURDUE PHARMA, L.P., PURDUE PHARMA, INC., PURDUE FREDERICK COMPANY, ABBOTT LABORATORIES, and ABBOTT LABORATORIES, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 2001-L-1458

## CLASS ACTION COMPLAINT

Comes now Plaintiff, ALLIED SERVICES DIVISION WELFARE FUND ("ASD Benefit Fund"), individually and on behalf of all others similarly situated, by its attorneys, and for its causes of action against Defendants - PURDUE PHARMA, L.P., PURDUE PHARMA, INC., PURDUE FREDERICK COMPANY (collectively referred to as *Purdue*), ABBOTT LABORATORIES, and ABBOTT LABORATORIES, INC., - brings this action as a class action pursuant to 735 ILCS 5/2-801, *et seq.*, and alleges as follows:

### PARTIES

1. Plaintiff, Allied Services Division Welfare Fund ("ASD Benefit Fund"), brings this class action on its own behalf and on behalf of a Class of Third-Party Payors (as defined below) who purchased and paid for, in whole or in part, prescriptions for OxyContin® during the Class Period. "Third-Party Payors" or "TPPs" refer to entities that pay for prescription drugs and includes entities such as union health and welfare funds, health insurers, health maintenance organizations ("HMOs"), managed-care providers and self-insured employers and their coverage plans.

2. At all times relevant herein, Defendant, PURDUE PHARMA, L.P. was and is a limited partnership with its principal place of business located at One Stamford Forum, Stamford, Connecticut. At all times relevant herein, Purdue Pharma, L.P. was and is transacting business in the State of Illinois. Further, said Defendant was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin® throughout the State of Illinois, and its actions have affected commerce within this County and the State of Illinois.

3. At all times relevant herein, Defendant, PURDUE PHARMA, INC., was and is a Delaware corporation with its principal place of business located at One Stamford Forum, Stamford, Connecticut. At all times relevant herein, Purdue Pharma, Inc. was and is transacting business in the State of Illinois. Further, said Defendant was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin® throughout the State of Illinois, and its actions have affected commerce within this County and the State of Illinois.

4. At all times relevant herein, Defendant PURDUE FREDERICK COMPANY was and is a Delaware corporation with its principal place of business in Norwalk, Connecticut. At all times relevant herein, Purdue Frederick Company was and is transacting business in the State of Illinois. Further, said Defendant was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin® throughout the State of Illinois, and its actions have affected commerce within this County and the State of Illinois.

5. At all times relevant herein, Defendant, ABBOTT LABORATORIES, was and is an Illinois corporation with its principal place of business in Abbott Park, North Chicago, Illinois. At all times relevant herein, Abbott Laboratories was and is transacting business in the State of Illinois. Further, said Defendant was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin® throughout the State of Illinois, and its actions have affected commerce within this County and the State of Illinois.

6. At all times relevant herein, Defendant, ABBOTT LABORATORIES, INC., was and is a Delaware corporation with its principal place of business in Abbott Park, North Chicago, Illinois. At all times relevant herein, Abbott Laboratories was and is transacting business in the State of Illinois. Further, said Defendant was and is in the business of designing, testing, manufacturing, marketing, advertising, promoting, distributing and/or selling OxyContin® throughout the State of Illinois, and its actions have affected commerce within this County and the State of Illinois.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this litigation pursuant to, 735 ILCS 5/2-209(a)(1), 735 ILCS 5/2-209(a)(2); 735 ILCS 5/2-209(b)(4) and 735 ILCS 5/2-209(c).

8. Venue is proper in this Court under 735 ILCS 5/2-101, because Plaintiff resides in this County, has paid for OxyContin® prescriptions for their plan participants and beneficiaries from this County, and because the Defendants transact business in this County. Venue is also proper under 815 ILCS 505/10a(b), because some of the transactions complained of herein occurred in Madison County.

9. All activities complained of herein occurred, in part, in Madison County, Illinois.

10. This Complaint alleges violations of the Illinois Consumer and Deceptive Practices Act, 815 ILCS 505/1 *et. seq*, including, but not limited to, the use or employment of deception, misrepresentation, concealment and/or suppression of material information, deceptive marketing strategies, and/or omission of material facts in the conduct of trade and commerce.

11. The relief sought herein includes actual damages, disgorgement of profits, punitive damages, and attorney fees.

## NATURE OF THE ACTION

12. OxyContin® is a narcotic pharmaceutical which contains oxycodone HCL, an opioid agonist. Defendant, Purdue Pharma, L.P., developed and patented OxyContin®, which was launched in December, 1995. Defendants - Abbott Laboratories and Abbott Laboratories, Inc.- co-promoted OxyContin®. OxyContin® is approved for use in the management and treatment of patients with moderate to severe pain who are expected to need continuous opioids for an extended period of time.

13. OxyContin® was initially available in 10 mg., 20 mg., and 40 mg. tablet strengths. In 1997, OxyContin® 80 mg. tablets became available and in July 2000, 160 mg. tablets became available.

14. OxyContin® is a federally controlled, Schedule II substance. As such, (1) it has a high and foreseeable potential for abuse; (2) its medical use in the United States is severely restricted; and (3) the abuse of the drug may lead to severe psychological or physical dependence. Because OxyContin® is a Schedule II drug, a prescription cannot even be called in to the pharmacy by the patient's doctor; rather, the patient must hand-carry the written prescription to a pharmacy.

4

15. OxyContin® tablets are manufactured with a controlled-release or time-release formulation. OxyContin® tablets are taken every twelve (12) hours, as opposed to short-acting pain medications, which must be taken every three to six hours. However, because of its controlled-release or time-release formulation, OxyContin® contains more milligrams of Oxycodone than any other drug on the market containing Oxycodone. For example, the 160 mg. form of OxyContin® contains as much of the active ingredient Oxycodone as thirty-two (32) Percocet pills.

16. At various times relevant herein, Defendants developed, designed, tested, manufactured, marketed, advertised, promoted, distributed and/or sold OxyContin® for the management of pain.

17. Following the launch of the drug in December 1995, sales quickly skyrocketed. During 2000, just four (4) years after its introduction into the marketplace, OxyContin® ranked 36th in sales in the United States of all prescription medications, with a total sales volume of $601,128,000.00, resulting from 3,505,000 prescriptions that year.

18. The enormous sales volume of OxyContin® was due primarily to Defendants' aggressive, nationwide and uniform marketing strategy (the "marketing strategy") aimed at physicians, pharmacists, and patients. Defendants developed this marketing and advertising strategy with the intent that physicians would prescribe OxyContin® and pharmacists would fill prescriptions for OxyContin®. However, that marketing strategy, which was heavily coercive, misrepresented the appropriate uses for OxyContin® and failed to adequately disclose and discuss the safety issues and possible adverse effects of OxyContin® use.

5

19. In fact, on May 11, 2000, the United States Food and Drug Administration (FDA) issued a warning letter to Purdue Pharma ordering it to cease the use of a standard Purdue Pharma advertisement that stated and/or implied that OxyContin® could be used to treat arthritis pain without first using milder drugs. That FDA letter stated, in pertinent part:

> You present the headline, 'Proven Effective in Arthritis Pain' on the first page of the journal ad, followed by the results of a study conducted in 133 patients with moderate to severe osteoarthritis on the second page. This presentation suggests that OxyContin® has been studied in all types of arthritis and can be used as a first-line therapy for the treatment of osteoarthritis ... You should immediately discontinue the use of this journal advertisement and all other promotional materials for OxyContin® that contain the same or similar claims or presentations.

(Purdue later withdrew the advertisement in question.)

20. Similarly, Defendants' sales representatives (also known as "detail persons") were sent by Defendants into the medical community with highly coercive but uniform, marketing tactics and advertising/promotional materials developed by Defendants with the intent that physicians would prescribe OxyContin® and pharmacists would fill these prescriptions for OxyContin®. Upon information and belief, Defendants and their employees or agents represented to physicians and pharmacists that OxyContin® "was safe enough to treat short-term pain," that it should be prescribed to elderly women with osteoarthritis, and that it should be prescribed "for everything," including moderate and low back pain.

21. In addition, Defendants "courted" physicians by paying doctors' transportation and hotel costs to attend weekend meetings to discuss pain management. At these meetings, Defendants would then recruit doctors and pay them fees to speak to other doctors at the more than 7,000 "pain management" seminars sponsored by Defendants around the United States. At those seminars, Defendants continued their nationwide, uniform marketing strategy of misrepresentation by marketing OxyContin® as a safe and effective way in which to treat all types of pain, including

minor pain. Despite their knowledge to the contrary, Defendants failed to provide the complete safety and risk information, much less mention the fact that OxyContin® was intended only to treat moderate to severe pain, or that it had an extraordinary potential for abuse.

22.     Moreover, despite knowing that OxyContin® could only be prescribed by a physician, Defendants pursued their uniform, nationwide marketing strategy of misrepresentation through marketing tactics aimed directly at consumers. As an example of that nationwide strategy, Defendants financed an Internet site called "Partners Against Pain." Through this public relations' web site, Defendants continued their national marketing strategy, promoting OxyContin® directly to members of the public. At least one purpose of this web site was to induce consumers to purchase OxyContin®. Despite their knowledge to the contrary, Defendants failed to provide consumers with complete safety and risk information, much less mention the fact that OxyContin® was intended only to treat moderate to severe pain, or that it had an extraordinary potential for abuse.

23.     At all times relevant herein, the national marketing strategy used by Defendants, as outlined above, was intended to create a market demand for OxyContin® induce the purchase and sale of OxyContin® tablets and allow Defendants to charge more for OxyContin® than they otherwise would have been able to charge, absent the market penetration of OxyContin®.

24.     As a result of their nationally developed, aggressive marketing tactics, Defendants achieved their intended purpose. OxyContin® rapidly become one of the most widely used painkillers in the United States, including the State of Illinois.

25.     Moreover, through their aggressive, nationwide and uniform marketing campaigns, Defendants encouraged the inappropriate prescription of OxyContin® in order to raise their market share of OxyContin® exponentially in a very short time. Consequently, this, too, has allowed Defendants to further their dominant share in the pharmaceutical "pain" market.

26. Moreover, Defendants were facilitating the inappropriate use of OxyContin® by supplying pharmacies in Mexico with OxyContin®, because Defendants were aware that members of the public (consumers) could obtain OxyContin® from those pharmacies without a prescription.

27. Upon information and belief, OxyContin® can be and is abused by crushing and/or dissolving the product, which creates a feeling of euphoria similar to that experienced when taking heroin. This type of use allows persons to obtain the full effect of an entire dose of OxyContin® immediately, rather than over the intended, time-release period. Despite their awareness of the abuse of OxyContin® by crushing and/or dissolving it to bypass the time-release mechanism, Defendants failed to take any steps to reformulate OxyContin® to prevent its abuse in this manner.

28. Specifically, Defendants failed to incorporate into the product formulation any feature that would have reduced the risk of bypass, diversion and abuse, all contributing to the high risk of misuse and/or addiction. Accordingly, as the use of OxyContin® by intended consumers mushroomed, so did the numbers of people who were being put at risk of misuse and/or addiction to the drug. (Recently, Defendant, Purdue, announced an intent to reformulate OxyContin® with an anti-narcotic additive that would prevent this form of abuse.)

29. Despite Defendants' awareness of the rising tide of abuse of OxyContin® in the aforementioned ways, Defendants continued their aggressive, uniform, nationwide marketing strategy for OxyContin®, and failed to take appropriate measures to ensure that OxyContin® was prescribed only in appropriate circumstances.

30. Ultimately, the use and abuse of OxyContin® engendered by Defendants' uniform, nationwide marketing practices and overwhelming market share of the drug, grew to such a level that the Federal drug enforcement officials asked Purdue to limit distribution of OxyContin® to

doctors who manage pain. This was the first time that the Drug Enforcement Agency (DEA) had targeted a specific prescription drug to curb its misuse.

31. As a result of Defendants' deceptive and aggressive marketing strategies, as outlined herein, Defendants have obtained a dominant share in the market for narcotic pain medications. Defendants have leveraged their dominant position in the market to charge more for OxyContin® than they could have, but for Defendants' deceptive trade practices and resulting dominant market share. Plaintiff and other Third-Party Payors have been injured by Defendants' practices because TTPs reimburse or pay, in whole or in part, for many or most prescriptions of OxyContin®.

## CLASS ALLEGATIONS

32. Plaintiff brings this action on behalf of itself pursuant to 735 ILCS 5/2-801, and as the representative of a Class, defined as follows:

> All Third-Party Payors in the State of Illinois, and in other states and territories of the United States who purchased and paid for, in whole or in part, OxyContin® during the past six (6) years up until such time as the Defendants cease the deceptive and fraudulent activities complained of herein.
>
> Excluded from the Class are the named Defendants, employees of Defendants, including their Officers and Directors; Plaintiff's counsel; and, the Judge of the Court to which this case is assigned.

33. The members of the Class are so numerous that joinder of all members is impracticable. Third-Party Payor purchases of OxyContin® during the Class Period number in the thousands nationally, and there are, at a minimum, hundreds of Third-Party Payor purchasers of OxyContin®. Nevertheless, Plaintiff and its counsel do not anticipate any difficulties with management of this action as a class action.

9

34. Common questions of law and/or fact predominate over any question affecting only individual members of the Class. Predominating, common questions include, but are not limited to:

(a) Whether Defendants developed and engaged in a uniform, national marketing strategy which failed to set forth material facts regarding the use of OxyContin®; and/or,

(b) Whether and when Defendants' knew that they were making material misrepresentations regarding OxyContin®; and/or,

(c) Whether Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information were a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; and/or,

(d) Whether Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information allowed them to maintain an artificially higher price for OxyContin® than they would have been able to, but for the dominant market share of OxyContin®; and/or,

(e) Whether Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information caused Plaintiff and other Third-Party Payors to pay more for each prescription of OxyContin®, than they otherwise would have, if Defendants had not engaged in the deceptive conduct alleged herein; and/or,

(f) Whether, through Defendants' deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information as alleged herein, Defendants unjustly retained a benefit to the detriment of Plaintiff and the Class.

35. Plaintiff is a member of the proposed Class and will fairly and adequately assert and protect the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of other members of the Class. Plaintiff has retained attorneys who are experienced in class action litigation.

36. A class action is an appropriate method for the fair and efficient adjudication of the controversy. Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### (Illinois Consumer and Deceptive Practices Act)

37. Plaintiff repeats and realleges all of the preceding and subsequent paragraphs as though more fully set forth herein.

38. In the course of trade and commerce involving OxyContin®, Defendants have engaged in a pattern of deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information with the intent that Plaintiff and other Third-Party Payors, as well as physicians, pharmacists and users of OxyContin® would rely on Defendants' misrepresentations and/or omissions of material facts.

39. As a consequence of Defendants' pattern of deceptive acts or practices which included their uniform, deceptive marketing strategies and/or concealment of material information with the intent that Plaintiff and other Third-Party Payors, rely on Defendants' misrepresentations and/or omissions of material facts, Plaintiff and members of the Class have been injured. Specifically, through their marketing strategies, Defendants were able to capture a larger share of the market for pain pharmaceuticals than would have been possible had Defendants been forthright with their advertising and marketing. Therefore, as a result, Defendants were able to overcharge for OxyContin® by capturing this dominant share of the market for narcotic pain medications. As a consequence, Plaintiff and other members of the Class paid more for OxyContin® than they would have, but for the artificially inflated price created by Defendants' deceptive practices.

## COUNT II
### (Unjust Enrichment)

40.     Plaintiff repeats and realleges all of the preceding paragraphs as though set forth herein.

41.     As a result of the deceptive and aggressive marketing of OxyContin®, Defendants have benefitted by capturing a dominant share in the market for narcotic pain medication, and have used the resulting dominant market position to charge Plaintiff and other Third-Party Payors more for each prescription of OxyContin®.

42.     Plaintiff and other Third-Party Payors have, to their detriment, conferred upon Defendants an economic benefit in the nature of revenues and profits resulting from prescriptions for OxyContin®, and higher prices paid by Third-Party Payors for said prescriptions of OxyContin®. These inequitably-obtained monies held by Defendants rightfully belong to Plaintiff and the Class.

43.     Similarly, Defendants' retention, without repayment, of monies paid for OxyContin® based on an overcharge directly made possible by Defendants' deceptive and aggressive marketing strategy, violates fundamental principles of justice, equity, and good conscience.

44.     Plaintiff and the Class should be awarded restitution of all inequitable proceeds received by Defendants as a result of their deceptive and aggressive marketing of OxyContin®.

45.     As a proximate cause of the deceptive and aggressive marketing strategy used by Defendants to advertise and promote sales of OxyContin®, Defendants have unjustly retained a benefit, all to the detriment of Plaintiff, and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.  That the proposed Class be certified pursuant to 735 ILCS 5/2-801, with Plaintiff certified as representative of the Class and Plaintiff's counsel designated as counsel for the Class; and/or,

B.  That Plaintiff and the Class be awarded actual damages for Defendants' violation of 815 ILCS 505/1, *et seq.*; and/or,

C.  That the Class be awarded costs and attorney fees, pursuant to 815 ILCS 505/10a(c); and/or,

D.  That Plaintiff and the Class be granted equitable relief in the nature of restitution to remedy Defendants' unjust enrichment; and/or,

E.  That this Court grant such other relief as the Court may deem just and proper under the circumstances.

CARR, KOREIN, TILLERY, KUNIN,
MONTROY, CATES, KATZ & GLASS, L.L.C.

BY: _____
JUDY L. CATES #00414743
Attorney for Plaintiffs
10 Executive Woods Court
Belleville, Illinois 62226
Phone: 618/277-1180
Fax: 618/277-9804

PROVOST UMPHREY, L.L.P.
YOUNGDAHL SADIN, P.C.
Jay Thomas Youngdahl
Joseph Arshawsky
Pilar Vaile
9621 Fourth Street N.W.
Albuquerque, NM 87114
(505) 792-8500
Fax: (505) 792-8700

13

PROVOST UMPHREY, L.L.P.
YOUNGDAHL SADIN, P.C.
Arthur Sadin
211 East Parkwood, Suite 207
Friendswood, TX 77546
(281) 992-1550
Fax: (281) 992-2617

**Attorneys for Plaintiff**