## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNTY 47 HEALTH AND WELFARE FUND, *et al.* | ** ** ** ** | |
| Plaintiffs, | ** ** | **Civil Action No. 1:07-cv-08761-JGK** |
| | ** ** | |
| v. | ** ** | |
| PURDUE PHARMA L.P. and THE PURDUE FREDERICK COMPANY INC. | ** ** ** | |
| Defendants. | | |

### THE PURDUE DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

Donald I Strauber
Mary T. Yelenick
Phoebe A. Wilkinson
Gretchen N. Werwaiss
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY  10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

*COUNSEL FOR*
*THE PURDUE DEFENDANTS*

Chilton D. Varner
Stephen B. Devereaux
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA  30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Patrick S. Davies
Joshua D. Greenberg
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: 202.662.6000
Fax: 202.662.6291

*OF COUNSEL FOR*
*THE PURDUE DEFENDANTS*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

ARGUMENT.......................................................................................................4

I.    Plaintiffs' Claims Should be Dismissed Pursuant to Rule 12(b)(1) Because
      Plaintiffs Lack Standing Under Article III. .........................................................5

      A.    Plaintiffs Have Not Alleged A Sufficient Injury in Fact. ..........................5

      B.    Plaintiffs Have Not Alleged A Sufficient Nexus Between Their Alleged
            Injury and Purdue's Alleged Misconduct. ...................................................8

II.   Plaintiffs Fail to State a Claim Under the UTPCPL ..............................................11

      A.    The UTPCPL Does Not Apply to These Types of Prescription Drug
            Claims .......................................................................................................11

      B.    The UTPCPL Does Not Protect These Plaintiffs .....................................13

      C.    Plaintiffs' UTPCPL Claim Fails Because Plaintiffs Have Not Pleaded the
            Elements Necessary to State a Claim .......................................................16

            1.    Plaintiffs Do Not Allege Reliance. ...............................................17

            2.    Plaintiffs failed to plead a false advertising claim. ......................18

            3.    Plaintiffs failed to plead a misrepresentation claim......................19

            4.    Plaintiffs failed to plead a guarantee/warranty claim ..................20

            5.    Plaintiffs failed to plead a claim for other fraudulent or
                  deceptive behavior .......................................................................21

      D.    Plaintiffs' Consumer Fraud and Unjust Enrichment Claims are Preempted
            by The Food, Drug, & Cosmetic Act and FDA Regulations. ...................21

III.  Plaintiffs' Warranty Claim Fails Because There is No Implied Warranty of
      Merchantibility for Prescription Drugs Under Pennsylvania Law. .......................22

IV.   Plaintiffs' Negligence Claim is Barred by the Economic Loss Doctrine .............23

V.    Plaintiffs Fail to State a Claim Under the Restatement (Second) of
      Torts § 402(B)....................................................................................................23

VI.   Plaintiffs' Unjust Enrichment Claim Should be Dismissed Because There Is No
      Underlying Tort, No Allegation of Payment to Purdue, and Plaintiffs Continue to

Reimburse For OxyContin Notwithstanding The Fact That They Must Know They Have Been Paying for Allegedly "Inappropriate" Prescriptions. .................24

VII.    Plaintiffs' UTPCPL, Unjust Enrichment, Warranty, Negligence, and Misrepresentation Claims Are Barred by the Applicable Statute of Limitations ..26

CONCLUSION...........................................................................................................30

## TABLE OF AUTHORITIES

CASES

*Achtman v. Kirby, McInerney & Squire, LLP,*
    464 F.3d 328, 337 (2d Cir. 2006) ............................................................4

*Acito v. IMCERA Group, Inc.,*
    47 F.3d 47, 51 (2d Cir. 1995) ..................................................... 19-20

*Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,*
    272 F. Supp. 2d 482, 491 (D. Pa. 2003) ....................................23

*Albertson v. Wyeth, Inc.,*
    63 Pa. D. & C. 4th 514, 539 (Pa. Com. Pl. 2003) ....................... 12-13

*Algrant v. Evergreen Valley Nurseries Ltd. Pshp.,*
    941 F. Supp. 495, 500 (E.D. Pa. 1996) ....................................15

*Allegheny General Hosp. v. Philip Morris, Inc.,*
    228 F.3d 429, 447 (3d Cir. 2000) ............................................25

*Allied Services Division Welfare Fund v. Purdue Pharma,*
    No. 2001-L-1458 (Ill. Sept. 17, 2001) (Attached as Exh. B to Peterson Decl.) ....................28

*Apace Communications, LTD v. Burke,*
    ---F.Supp.2d---2007 WL 4125232, *4 (W.D.N.Y. Nov. 16, 2007)..........................4

*Aronberg v. FTC,*
    132 F.2d 165 (7th Cir. 1942) ..................................................15

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l., Ltd.,*
    968 F.2d 196, 198 (2d. Cir. 1992) ............................................5

*Baker v. Family Credit Counseling Corp.,*
    440 F. Supp. 2d 392 (E.D. Pa. 2006) ....................................17, 20, 25

*Balderston v. Medtronic Sofamor Danek, Inc.,*
    285 F.3d 238, 242 (3d Cir. 2002) ............................................14

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955, 1964-65 (2007) ............................................4, 8

*Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
    433 F.3d 181, 198 (2d. Cir. 2005) ............................................5

*Charles of the Ritz Distribs. v. FTC*,
  143 F.2d 676 (2d Cir. 1944) ................................................................................15

*Cleveland v. Caplaw Enterprises*,
  448 F.3d 518, 521 (2d Cir. 2006) .........................................................................4

*Colacicco v. Apotex, Inc.*,
  432 F. Supp. 2d 514, 547-48 (E.D. Pa. 2006) ..........................................12, 13, 22

*Cole v. Lawrence*,
  701 A.2d 987, 989 .............................................................................................27

*Desiano v. Warner Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003) ......................................................................2, 6, 10

*DiLucido v. Terminix Int'l, Inc.*,
  676 A.2d 1237, 1242 (Pa. Super. Ct. 1996)....................................................14-15

*Ellenbogen v. PNA Bank*,
  731 A.2d 175, 188 n.26 (Pa. Super. Ct. 1999)......................................................23

*Foister v. Purdue Pharma, L.P.*,
  295 F.Supp.2d 693, 704 (W.D. Ky. 2003)..............................................................9

*Gabriel v. O'Hara*
  534 A.2d 488, 494-95 (Pa. 1987) .......................................................................26

*Gulf Oil Corp. v. FTC*,
  150 F.2d 106, 119 (5th Cir. 1945) ......................................................................15

*Gully v. NCUA Bd.*,
  341 F.3d 155, 161 (2d Cir. 2003) .........................................................................5

*Hahn v. Richter*,
  673 A.2d 888, 891 (Pa. 1996) ............................................................................11

*Heindel v. Pfizer, Inc.*,
  381 F. Supp. 2d 364, 383-84 (D.N.J. 2004)..............................................13, 18, 22

*Howland v. Purdue Pharma L.P.*,
  821 N.E.2d 141, 143 (Ohio 2004) ......................................................................27

*In re Guidant Corp.*,
  484 F. Supp. 2d 973, 984 (D. Minn. 2007)...................................................*Passim*

*In re Rezulin Prods. Liab. Litig.*,
  --- F. Supp. 2d ---, 2007 WL 4165703, at *3 (S.D.N.Y. Nov. 26, 2007) ..................2, 6-7, 10

ii

*In re Rezulin Prods. Liab. Litig.*,
   392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................................................16, 25

*In re Smith*,
   866 F.2d 576, 581 (3d Cir. 1989) ....................................................................15

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.,
   Inc.*, 929 A.2d 1076, 1080 (N.J. 2007) .......................................................... 15-16

*Klages v. General Ordinance Equipment Co.*,
   367 A.2d 304, 311 (Pa. Super. Ct. 1976)............................................................24

*Labzda v. Purdue Pharma, L.P.*,
   292 F.Supp.2d 1346, 1356 (S.D. Fla. 2003) .........................................................9

*LaFleur v. Whitman*,
   300 F.3d 256, 269 (2d Cir. 2002) ......................................................................5

*Lal v. Ameriquest Mortg. Co.*,
   858 A.2d 119 (Pa. Super. 2004) ......................................................................13

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273, 290 (2d Cir. 2006) ......................................................................5

*Luke v. Am. Home Prods. Corp.*,
   No. 1998-C-01977, 1998 WL 1781624, at *8 (Pa. Com. Pl., Nov. 18, 1998) .......................12

*Makripodis v. Merrell-Dow Pharm.*,
   523 A.2d 374 (Pa. Super. 1987) ......................................................................22

*Martin v. Evans*,
   711 A.2d 458, 461 (Pa. 1998)..........................................................................23

*McGraw v. Purdue Pharma*,
   No. 01-C-137-S (W.Va. June 11, 2001) (Attached as Exh. A to Peterson Decl.)..................28

*New Mexico Fund v. Purdue, et al.*,
   No. 07 CV 6916..........................................................................................22

*Pa. Employees Benefit Trust Fund v. Zeneca, Inc.*,
   499 F.3d 239, 251 (3d Cir. 2007) ............................................................. 3, 21-22

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   ---F.3d ---2007 WL 3071637, at *2 (2d Cir. 2007) ..................................................4

*Prohias v. Pfizer, Inc.*,
   485 F. Supp.2d 1329, 1334-35 (S.D. Fla. 2007).....................................................26

iii

*Sexton v PNC Bank*,
   792 A.2d 602 (Pa. Super. 2002) ........................................................................21

*Shah v. Meeker*,
   435 F.3d 244, 249-50 (2d Cir. 2006) ..............................................................28

*Soufflas v. Zimmer, Inc.*,
   474 F. Supp.2d 737, 752 (E.D. Pa. 2007) ......................................................21

*Spencer v. Kemma*,
   523 U.S. 1, 10-11 (1998) ...................................................................................5

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
   171 F.3d 912, 936 (3d Cir. 1999) ....................................................................24

*Tesauro v. Quigley Corp.*,
   No. 1011, 2001 WL 1807782, at *4 (Pa. Com. Pl., Apr. 9, 2001) ...................20

*Toy v. Metro. Life Ins. Co.*,
   863 A.2d 1, 9 (Pa. Super. 2004) ..................................................................20-21

*Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*,
   574 A.2d 641, 647 (Pa. Super. 1990) ..........................................................13-14

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964)..........................................................................................26

*Vladimir v. Cowperthwait*,
   No. 06 Civ. 5863(JGK), 2007 WL 1964157, at *1 (S.D.N.Y. July 3, 2007) ............4

*Walter v. Magee-Womens Hosp. of UPMC Health Sys.*,
   876 A.2d 400, 406 (Pa. Super. 2005) ..........................................................19, 25

*Whalen v. Pfizer, Inc.*, No. 600125/05 2005 WL 2875291, at *5 (N.Y. Sup. Ct. Sept. 22,
   2005) ................................................................................................................26

*Weinberg v. Sun Co., Inc.*,
   565 Pa. 612 (Pa. 2001)................................................................................18-19

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
   854 A.2d 425, 438 (Pa. 2004) .........................................................................17

STATUTES

73 P.S. 201-1 et seq. ................................................................................ *Passim*

42 Pa. C.S. § 5524 ..................................................................................... 27

42 Pa. C.S. § 5524(7) ................................................................................. 27

42 Pa. C.S. § 5525 ..................................................................................... 27

42 Pa. C.S. § 5527(6) ................................................................................. 26

21 U.S.C. § 301, et. seq. .............................................................................. 3

28 U.S.C. § 1404 ....................................................................................... 26

OTHER AUTHORITIES

Blacks Law Dictionary (6th Ed. 1991) ........................................................... 6

Fed. R. Civ. Pro. 12(c) ............................................................................ 1, 4

Federal Rule of Civil Procedure 9(b) ...................................................... 4, 17, 19-20

Feds Seek to Limit Painkiller Use, ABC NEWS (May 1, 2001) ..................................... 30

Barry Meier, U.S. Asks Painkiller Maker to Help Curb Abuse, THE NEW YORK TIMES,
    2001 WLNR 3357947, May 1, 2001 ........................................................... 29

Ian Zack, Drug Abusers Turn the Spotlight on a Pair of Shy Pharmaceutical Moguls,
    FORBES, 2001 WLNR 7730142, Feb. 5, 2001 ................................................. 29

Marc Levy, Powerful Painkiller Pops Up On The Streets, THE PHILADELPHIA INQUIRER,
    2001 WLNR 2412846, Feb. 27, 2001 ....................................................... 28-29

Mark Ludak, Residents Share, PHILADELPHIA DAILY NEWS, 2001 WLNR 1635376, Feb.
    28, 2001 ................................................................................. 29

Nicole Weisensee, Killer, PHILADELPHIA DAILY NEWS, 2001 WLNR 1633803, Feb. 27,
    2001 ..................................................................................... 29

Painkiller Drug Bust: Drug Busts Uncover Abuse of OxyContin, ABC NEWS (Feb. 9,
    2001) .................................................................................... 30

Prescription Pain Medication OxyContin is Quickly Becoming the Drug of Choice for
    Many Abusers, NPR: ALL THINGS CONSIDERED, 2001 WLRN 11928904, Jan. 26,
    2001 ..................................................................................... 30

Restatement (Second) of Torts § 402(B) .............................................................. *Passim*

Restatement of Restitution § 106 ........................................................................25

Roger Alford, *Across the East, Abuse of Painkiller Meant for Cancer Patients Is Rising*,
THE PHILADELPHIA INQUIRER, 2001 WLNR 2425791, Feb. 10, 2001 ............................ 1-2, 29

Tomothy Roche, *The Potent Perils of a Miracle Drug: OxyContin is a Leading*
*Treatment for Chronic Pain, But Officials Fear it May Succeed Crack Cocaine on the*
*Street*, TIME, 2001 WLNR 10076065, Jan. 8, 2001 .......................................... 29-30

Defendants Purdue Pharma L.P. and The Purdue Frederick Company Inc. ("Purdue") respectfully submit this Memorandum in support of their Motion to Dismiss pursuant to Fed. R. Civ. Pro. 12(c).

## INTRODUCTION

Plaintiffs are third-party payors ("TPPs") who provide "prescription drug benefit plans and coverage" to their members. (Compl. ¶ 14.) While the exact nature of Plaintiffs' business is unclear from the Complaint, Plaintiffs assert that they are entitled to recover costs they allegedly incurred reimbursing their members for "excessive, unnecessary, abusive, or diverted purchases of OxyContin." (*Id.* ¶ 35.) According to Plaintiffs, Purdue allegedly misrepresented the safety and efficacy OxyContin to doctors who, in reliance on these alleged misstatements, wrote "excessive" or "unnecessary" prescriptions to Plaintiffs' members, who, in turn, sought reimbursement and/or payment from Plaintiffs. Plaintiffs apparently also seek to recover damages for reimbursements made to those members who, in violation of state and federal criminal law, "abused" or "diverted" OxyContin (*id.*). Even taking Plaintiffs allegation as true -- that Purdue misled certain doctors into prescribing improperly for certain patients -- Plaintiffs' claim is thus purely derivative of the independent (and sometimes illegal) actions of parties (*i.e.*, doctors and their patients) not before this Court. Remarkably, Plaintiffs have apparently made no change in their reimbursement practices as result of learning the "truth" about OxyContin despite the more than seven years that have passed since reports about the abuse and diversion and "excessive" prescribing of OxyContin hit the front pages of newspapers around the country. *See, e.g.,* Roger Alford, *Across the East, Abuse of Painkiller Meant for Cancer Patients Is Rising,* THE PHILADELPHIA INQUIRER, 2001 WL 2425791, Feb. 10, 2001, at p. A08 (reporting that OxyContin "is being abused throughout the East," that people were known to abuse OxyContin by "crushing the pills into powder and snorting it, or injecting it to get a euphoric

high similar to that of heroin," and that as a result OxyContin "sells on the illegal drug market for up to $100 a pill."). According to the Complaint, Plaintiffs **continue to this day** to reimburse their members for "excessive, unnecessary, abusive, or diverted purchases of OxyContin." (*See id.* ¶ 35.)

Undaunted by the broad disconnect between their alleged injury and Purdue's alleged misconduct, Plaintiffs bring claims for (1) consumer fraud under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); (2) unjust enrichment; (3) breach of implied warranty of merchantibility; (4) negligence; and (5) misrepresentation under the Restatement (Second) of Torts § 402(B). Even taking Plaintiffs' factual allegations as true for purposes of this motion, none of these causes of action are viable.

**First**, Plaintiffs lack Article III standing. Plaintiffs have failed to allege a concrete injury-in-fact and have failed to allege a sufficient causal nexus between any misconduct and any perceived injury. *Compare In re Guidant Corp.*, 484 F. Supp. 2d 973, 984 (D. Minn. 2007) (dismissing third-party payor claim where, as here, it rested "on the independent choices of doctors" *and* patients, and was therefore "too speculative to establish a causal link between the alleged injury and the alleged misconduct."), *and In re Rezulin Prods. Liab. Litig.*, --- F. Supp. 2d ---, 2007 WL 4165703, at *3 (S.D.N.Y. Nov. 26, 2007) (dismissing third-party payors' claim that "they were injured because patients and the medical community were misled.") *with Desiano v. Warner Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) (upholding TPP plaintiffs' claim because they alleged that they themselves had been misled).

**Second**, the UTPCPL does not apply to alleged misrepresentations regarding the safety of prescription drugs. Under Pennsylvania law, a manufacturer's duty to provide information and warnings about prescription drugs runs only to physicians, not patients, or *a fortiori*, more

remote third-party payors. The statute also does not protect commercial third-party payors such as Plaintiffs engaged in routine business transactions; it protects consumers who purchase goods for *household or personal use*. Additionally, Plaintiffs have failed to plead the elements necessary to state a claim under the UTPCPL. Moreover, even had it been properly pleaded, Plaintiffs' UTPCPL claims would be preempted by the Food, Drug, & Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et. seq.*, and FDA regulations. *Pa. Employees Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239, 251 (3d Cir. 2007).

*Third*, Pennsylvania law does not recognize an implied warranty for prescription drugs. Consequently, Plaintiffs' claim for breach of implied warranty is not cognizable under Pennsylvania law.

*Fourth*, Plaintiffs' negligence claim is barred by the economic loss doctrine, which, subject to limited exceptions not present here, prohibits recovery in negligence for purely economic loss unaccompanied by physical injury or property damage.

*Fifth*, Plaintiffs fail to state a claim for misrepresentation under the Restatement (Second) of Torts § 402(B) because there is no allegation of physical harm to a consumer caused by justifiable reliance on a misrepresentation of material fact made by Purdue.

*Sixth*, Plaintiffs' unjust enrichment claim fails because, as shown below, there is no underlying tort, no allegation of payment to Purdue, and, in any event Plaintiffs continue to reimburse their members for OxyContin notwithstanding the fact that Plaintiffs must have been aware (since at least 2001) that they have been paying for allegedly inappropriate prescriptions.

*Seventh*, Plaintiffs' UTPCPL, Unjust Enrichment, Warranty, Negligence, and Misrepresentation claims are barred by the applicable statutes of limitation.

As more fully set forth below, the Court should dismiss Plaintiffs' Complaint in its entirety with prejudice.

## ARGUMENT

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006). Under this standard, "a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). As many courts have now recognized, in *Twombly*, the Supreme Court "stiffened the pleading standards under the Federal Rules." *Apace Communications, LTD. v. Burke*, ---F.Supp. 2d---2007 WL 4125232, at *4 (W.D.N.Y. Nov. 16, 2007). After *Twombly*, "a complaint must *allege facts* that are not merely consistent with the conclusion that the defendant violated the law, but which *actively and plausibly* suggest that conclusion." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, ---F.3d ---2007 WL 3071637, at *2 (2d Cir. Oct. 23, 2007) (emphasis added). Stated differently, a plaintiff "must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Vladimir v. Cowperthwait*, No. 06 Civ. 5863(JGK), 2007 WL 1964157, at *1 (S.D.N.Y. July 3, 2007) (Koeltl, J.) (quoting *Bell Atlantic*, 127 S. Ct. at 1974).

Even before *Twombley*, it was clear that "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.'" *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006). In addition, Plaintiff must satisfy Federal Rule of Civil Procedure 9(b) to the extent that its claims are based on allegations of fraud. The Second Circuit has held that "to comply with Rule 9(b), 'the complaint must: (1)

4

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  Plaintiffs' Complaint here is utterly lacks the required specificity.

I.    **Plaintiffs' Claims Should be Dismissed Pursuant to Rule 12(b)(1) Because Plaintiffs Lack Standing Under Article III.**

To satisfy the requirements for Article III standing, Plaintiffs must show (1) a concrete and particularized injury-in-fact that is not conjectural or hypothetical, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood, not just mere speculation, that a favorable decision will redress the injury.  *See LaFleur v. Whitman*, 300 F.3d 256, 269 (2d Cir. 2002) (citation omitted).  Article III mandates that "inferences favorable to the party asserting jurisdiction should not be drawn" and the requirements for Article III standing "must affirmatively appear in the record."  *See Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l. Ltd.*, 968 F.2d 196, 198 (2d. Cir. 1992); *Gully v. NCUA Bd.*, 341 F.3d 155, 161 (2d Cir. 2003) (quoting *Spencer v. Kemma*, 523 U.S. 1, 10-11 (1998)).  If a plaintiff lacks standing, the court must dismiss the case on that ground.  *See Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,* 433 F.3d 181, 198 (2d Cir. 2005).

A.    **Plaintiffs Have Not Alleged A Sufficient Injury in Fact.**

Plaintiffs fail to allege that they have suffered a concrete and particularized injury-in-fact. Although Plaintiffs claim in conclusory fashion that they suffered injury as a result of their purchase or reimbursement of OxyContin (Compl. ¶ 15), they offer no support for this assertion. For this reason alone, the Court should disregard it.  *See, e.g., In re Guidant*, 484 F.Supp.2d at 983 (rejecting third-party payor plaintiffs conclusory allegation that they were purchasers of

prescription medical devices that suffered direct injuries where, as here, they provided no factual

support of their assertion).  Moreover, the few factual allegations Plaintiffs do provide about the

nature of their business establish, beyond doubt, that they were not actual purchasers of

OxyContin, much less purchasers who suffered some form of direct injury.  Like all third-party

payors, Plaintiffs simply provide prescription drug "benefits" to their members.  (Compl. ¶ 14.)

Unlike an actual purchaser, Plaintiffs never take title or develop any ownership interest in the

drugs they cover.  *See* <u>Blacks Law Dictionary</u> (6th Ed. 1991) (A "purchaser" is "[o]ne who

acquires either real or personal property by buying it for a price in money.")  Moreover,

according to the Complaint, Plaintiffs rely on their members and their members' doctors to

determine whether particular prescriptions should or should not be purchased.  (*See* Compl. ¶ 17

(the Plaintiffs "rely on persons causing claims to be submitted for payment . . . to recognize and

honor the permissible scope of reimbursement and to obey the governing law and regulations in

activities that cause such claims").  Thus, as they are obligated to do by law, Plaintiffs simply

provide a means through which *their members* purchase prescription drugs.[1]

---

[1] As a panel of the Second Circuit noted in *dictum* in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003), there is authority in the antitrust context that an insurer can be considered a buyer of prescription pharmaceuticals to the extent the insurer alleges that it has entered into reimbursement contracts with pharmacy companies.  *See Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003) (discussing antitrust cases).  This is not, of course, an antitrust case.  Nor have Plaintiffs pleaded any factual basis to support their assertion that they are purchasers.  Moreover, after *Twombley*, it is no longer appropriate simply to accept such an allegation.  Thus, in *Desiano*, which was decided before *Twombley* and relied on the now-discredited pleading standard set forth in *Conley v. Gibson*, *see id.* at 347, the panel erred to the extent it accepted the plaintiffs mere assertion that they were purchasers of Rezulin, *id.* at 350-51.  In any event, *Desiano* is inapposite because the plaintiffs there alleged with sufficient particularity that the defendants' "fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations."  *Id.* at 349.  Plaintiffs have made no such allegation here.  *See, e.g., In re Rezulin Prods. Litig.*, 2007 WL 4165703, at *3 (distinguishing *Desiano* because the *In re Rezulin* TPP alleged only that it was a victim of a

6

Moreover, none of the Plaintiffs claim that they had any relationship with Purdue, the manufacturer of OxyContin, nor do the Plaintiffs assert that they reimbursed the actual purchasers of the drug based on any alleged communication with or misrepresentation by Purdue. Plaintiffs merely state that they "purchased OxyContin for use by their members or retirees, and/or reimbursed members or retirees for their purchases of OxyContin," (Compl. ¶ 15), and have somehow "suffered actual, ascertainable losses, in that they paid for or reimbursed for purchases of OxyContin," (Compl. ¶ 51). Merely paying for drugs without being an active, direct participant in the transaction at issue does not constitute concrete and particularized injury sufficient to satisfy the requirements of Article III standing:

> The named TPP [third-party payor] Plaintiffs provide no support for their assertion that they are purchasers. There are no allegations in the Master Complaint that the TPPs agreed to pay for the devices at issue and related costs *based on their relationship with Guidant or representations Guidant made to it*. There is no allegation that the named TPP Plaintiffs had any role in selecting which devices a patient should receive. And there are no allegations that the named TPP Plaintiffs agreed to pay a certain price for the devices *based on Guidant's statements or to grant Guidant some sort of preferred or approved status, thereby creating a direct relationship between the named TPP Plaintiffs and Guidant*.

*In re Guidant Corp.*, 484 F. Supp. 2d at 983 (denying standing to third-party payors alleging violation of Pennsylvania UTPCPL based on payment for defective medical device) (emphasis added). Indeed, Plaintiffs are so far removed from the transactions at issue here that ***they continue even today*** to reimburse their members for allegedly "excessive, unnecessary, abusive, or diverted purchases of OxContin" even though they must have known for years that they have

---

fraud perpetrated on its members "and not because [it] was itself deceived"); *In re Guidant*, 484 F.Supp.2d at 983 (distinguishing *Desiano* on the ground that the third-party payor plaintiffs there alleged that they "suffered direct injuries related to [their] agreement to buy drugs at a high price when cheaper alternatives were available").

7

been doing so.  (*See* Compl. ¶ 35; *infra* Section VII (describing widespread publicity of abuse and diversion and "excessive" prescribing of OxyContin).)  In other words, because Plaintiffs were only passive (and apparently indifferent) participants in the actual transactions from which they claim their damages arise, they cannot be said to have sustained any injury-in-fact.

> **B.    Plaintiffs Have Not Alleged A Sufficient Nexus Between Their Alleged Injury and Purdue's Alleged Misconduct.**

Plaintiffs lack standing to proceed with this case for the additional reason that the Complaint fails to establish a causal connection between Purdue's putative conduct and the Plaintiffs' alleged injuries.  "Standing requires a causal connection between the injury and the conduct complained of, specifically, the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court."  *In re Guidant*, 484 F.Supp.2d at 984.  As a threshold matter, the few examples of Purdue's alleged misconduct listed in the Complaint concern conduct directed exclusively towards doctors (not Plaintiffs).[2]  Specifically, Plaintiffs allege that Purdue intentionally misrepresented the characteristics of OxyContin "*to prescribers* who treat Fund participants,"

---

[2]    After setting forth several pages of factual allegations, Plaintiffs assert for the first (and only) time -- in the boilerplate portion of Count I of the Complaint -- that Purdue misrepresented, concealed, or omitted information *from Plaintiffs. See* Compl. ¶ 47.  The Complaint is entirely devoid, however, of any factual allegations to support that assertion.  As to when any such alleged misrepresentations or omissions occurred, the Complaint is silent.  As to how such alleged misrepresentations or omissions affected Plaintiffs, the Complaint is silent.  As to what action Plaintiffs took when they learned the "truth" about OxyContin, the Complaint is silent.  The Complaint alleges only that the Plaintiffs paid for or reimbursed its members for purchases of OxyContin.  A single unsupported conclusory allegation that Purdue misrepresented information from Plaintiffs is insufficient.  *See Twombley*, 127 S.Ct. at 1964-65 (A plaintiff must provide more than "labels and conclusions" and the "factual allegations must be enough to raise a right to relief above the speculative level"); *In re Guidant*, 484 F.Supp.2d at 983 (rejecting TPP plaintiffs' assertion that they "suffered direct injuries" where the complaint provided no support for that assertion).  Moreover, as shown below, this conclusory allegation is inconsistent with Plaintiffs' theory of relief.

that Purdue improperly "promoted the drug *to physicians*," and that Purdue made "misleading and false promotional statements about OxyContin *to* healthcare professionals." (Compl. ¶¶ 19-20, 34 (emphasis added).)

Perhaps more importantly, the nature of the relief sought by Plaintiffs *requires* that Purdue's alleged misconduct be directed at parties not before the Court. Plaintiffs do not purport to recover for all OxyContin prescriptions written to their members. On the contrary, they seek to recover only "for excessive, unnecessary, abusive, or diverted purchases of OxyContin . . . ." (*id.* ¶ 35; *see also id.* ¶ 48 ('Said misrepresentations, concealment and/or omissions were likely to deceive and/or in fact caused Plaintiffs and other members of the class *to purchase for excessive purchases of OxyContin, particularly from the effects of addiction and dependency.*" (emphasis added).) Under Plaintiffs' theory, Plaintiffs would have to prove something like the following chain of events with respect to every prescription for which they seek relief: (1) Purdue must have made a misrepresentation to a doctor; (2) the doctor must have heard and relied on that alleged misrepresentation in prescribing OxyContin to one of Plaintiff's members; (3) OxyContin was not, in fact, indicated for the member, *or* the member was an appropriate candidate at the beginning of treatment but subsequently became "addicted" to OxyContin, *or* the member lied to the doctor about the nature of his/her condition so as to obtain OxyContin illegally and either sell it to others or to abuse it him or herself; and (4) Plaintiff reimbursed the member for the "unnecessary, abused, or diverted" prescription. In short, Plaintiff's theory depends entirely on what transpired between Purdue, doctors and their patients. It has nothing whatsoever to do with statements Purdue may or may not have made to Plaintiffs.

Further complicating matters, to segregate legitimate from illegitimate prescriptions and establish the right to recover, Plaintiffs must somehow rule out a series of potential intervening

9

causes involving parties not before the Court. Among many other possibilities, intervening causes include the possibility that Plaintiffs' members abused and/or diverted OxyContin for personal gain in violation of state and federal criminal law. *See, e.g., Foister v. Purdue Pharma, L.P.*, 295 F.Supp.2d 693, 704 (E.D. Ky. 2003) ("The proximate cause of any alleged injury in such circumstances is the alteration and/or abuse of the drug, not the drug itself."); *Labzda v. Purdue Pharma, L.P.*, 292 F.Supp.2d 1346, 1356 (S.D. Fla. 2003) ("intentional misuse of an intoxicating product is the sole proximate cause of the injury . . . ."). As if that were not enough to break the casual chain, to the extent members submitted claims for abused or diverted OxyContin to Plaintiffs, they both breached their agreements with Plaintiffs and (likely) defrauded them as well. (*See* Compl. ¶ 17.)

Because there is no claim here that Plaintiffs were "directly harmed by [any] deception practiced on *[it]*," the Complaint cannot be construed as alleging that Plaintiffs were "*direct victims* of [Purdue's] fraudulent marketing." *Desiano*, 326 F.3d at 349 n.9, 351. *See, e.g., In re Rezulin*, 2007 WL 4165703, at *3 (rejecting third-party payors' contention that "they are entitled to recover because defendants misled patients and the medical community concerning the safety and efficacy of Rezulin in consequence of which, they claim, [they were] called upon to reimburse for prescriptions that otherwise would not have been written at prices that otherwise could not have been charged").[3] On the contrary, causation under Plaintiffs' theory would be far too tenuous because it would rest not only on potentially illegal acts of third parties but on "the *independent* choices of the doctors who recommend the [medication] to their patients and on the patients who decide to receive the [medication], in lieu of other treatment options, if any." *In re*

---

[3]     As noted above, in sharp contrast, *Desiano* involved "claims of damages that were caused directly by [the] alleged fraud" because the defendant "misrepresented its product *to Plaintiffs*." 326 F.3d at 340, 350.

10

*Guidant Corp.*, 484 F. Supp. 2d at 984 (emphasis added) (relying on *Rivera*, a case involving prescription drugs). Thus, "the causation link would depend on concluding that had the defendant acted lawfully, the doctor would not have prescribed the drug and the patient would not have taken it." *Id*. at 984. Such a conclusion would be "too speculative to establish a causal link between the alleged injury and the alleged misconduct." *Id.* Accordingly, Plaintiffs lack standing to assert their claims and their Complaint should be dismissed in its entirety.

## II.    Plaintiffs Fail to State a Claim Under the UTPCPL.

Plaintiffs fail to state a claim under the UTPCPL[4] because (1) the UTPCPL does not apply to these types of prescription drug claims; (2) the UTPCPL does not protect these Plaintiffs; (3) Plaintiffs do not meet the pleading requirements necessary to state a claim under the UTPCPL; and (4) Plaintiffs' UTPCPL claims are preempted by the FDCA and FDA regulations.

### A.    The UTPCPL Does Not Apply to These Types of Prescription Drug Claims.

The UTPCPL does not provide a basis to assert a claim for alleged misrepresentations or concealment of information regarding the safety of prescription drugs. First, it is settled that such claims give rise to liability, if at all, only under a theory of negligence:

> [W]here the adequacy of the warnings associated with prescription drugs is at issue, the failure of the manufacturer to exercise reasonable care to warn of dangers, i.e., the manufacturer's negligence, is the only recognized basis of liability.

*Hahn v. Richter*, 673 A.2d 888, 891 (Pa. 1996). In a case like this one, alleging misrepresentations and omissions about "the dangerous nature of Oxycontin" (Compl. ¶ 47), a UTPCPL claim, which is not a claim based on negligence, is not an appropriate cause of action.

---

[4]      73 P.S. § 201-2 *et seq*.

*See, e.g., Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 547-48 (E.D. Pa. 2006) (holding that *Hahn* warranted dismissal of plaintiff's New York consumer protection law claim).

Second, Plaintiffs' UTPCPL claim is barred by the learned intermediary doctrine, which provides that a drug manufacturer must provide information and warnings about the drug *to physicians, but not to patients. Albertson v. Wyeth, Inc.*, 63 Pa. D. & C. 4th 514, 539 (Pa. Com. Pl. 2003). In *Albertson*, patients brought claims against a drug manufacturer under the UTPCPL based on the defendant's failure to warn of certain risks and failure to acknowledge a lack of efficacy in certain treatments. *Id.* at 537. The court dismissed the claim, holding that "[t]here can be no cause of action based on Defendant's alleged omissions because defendants had no duty to disclose any information directly to plaintiff." *Id.* at 538. The same would certainly be true of UTPCPL claims brought by third-party payors, who are at least one step removed from the patient, the doctor, and Purdue.

*Albertson* stressed that prescription drugs, which have varying safety and efficacy depending on the patient, the condition being treated, and other factors, do not fall within the ambit of the UTPCPL:

> [T]o permit a cause of action under the UTPCPL in this case would effectively make a drug manufacturer the absolute guarantor of the anticipated results and effects of a prescription drug. Pennsylvania law, however, recognizes that some prescription drugs by their very nature can never be made safe. An inconsistency would result if we were to hold that drug manufacturers must guarantee that prescriptions drugs are completely safe. The premise behind the UTPCPL was not meant to engender such a result.

*Id.* (internal citation omitted) (citing *Luke v. Am. Home Prods. Corp.*, No. 1998-C-01977, 1998 WL 1781624, at *8 (Pa. Com. Pl., Nov. 18, 1998)).

Additionally, the *Albertson* court explicitly refused to adopt an exception to the learned intermediary doctrine based upon the defendant drug manufacturer's advertising practices, reasoning that "[m]edia dissemination of information concerning the existence of these drugs does not enhance the public's ability to acquire them . . . the consumer still required a prescription from a physician, a learned intermediary." *Id*. at 539. Consequently, Plaintiffs' allegations regarding the marketing and promotion of OxyContin do not alter the analysis or the end result under Pennsylvania law: these types of claims are not actionable under the UTPCPL.

The purpose and function of consumer protection statutes is to protect consumers, while the learned intermediary doctrine provides that a prescription drug manufacturer's duty to warn runs only to physicians -- not to consumers or, *a fortiori*, third-party payors. Consequently, "[T]he [consumer protection] statute and the [learned intermediary] doctrine are inherently inconsistent with one another."[5] *Colacicco*, 432 F. Supp. 2d at 552 (dismissing a claim based on the New York consumer protection law); *see also Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 383-84 (D.N.J. 2004) (interpreting the Pennsylvania UTPCPL and rejecting plaintiffs' UTPCPL claims). Accordingly, Plaintiffs' UTPCPL claim fails as a matter of law.

**B.    The UTPCPL Does Not Protect These Plaintiffs.**

A private cause of action may only be maintained under the UTPCPL by a "person who purchases or leases goods or services primarily for personal, family or household purposes." 73 P.S. § 201-9.2(a). In short, commercial transactions are not governed by the UTPCPL. *See, e.g., Lal v. Ameriquest Mortg. Co.*, 858 A.2d 119 (Pa. Super. 2004). Whether a purchase is primarily for personal, family, or household purposes hinges on the purpose of the purchase, rather than

---

[5] The *Colacicco* court denied the defendant's motion to dismiss *the entire complaint* on the basis of the traditional learned intermediary doctrine defense. However, when considering the individual claims, the court found that the learned intermediary doctrine barred plaintiff's claim under the New York consumer protection law.

the type of product purchased. *Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 647 (Pa. Super. 1990). If the product purchased is a "consumer good," but it is purchased for a business purpose, the transaction does not fall under the UTPCPL. *See id.* (providing, by way of example, that if a laundry business bought a clothes dryer for the purpose of drying clothes *for the business*, the company could not maintain a UTPCPL claim relating to the dryer because, although the dryer is a consumer good, its purchase was for a business purpose).

As third-party payors, Plaintiffs plainly admit that their function is to provide prescription drug and medical benefits to their members. According to the Complaint:

- The benefits provided by each of the Plaintiff Funds include prescription drug benefit plans and coverage, which are self-insured by the respective Funds and administered through a Prescription Benefit Manager ("PBM"). The Funds also provide coverage for medical benefit plans.

- During the relevant time period, the Funds purchased OxyContin for use by their members or retirees, and/or reimbursed members or retirees for their purchases of OxyContin.

(Compl. ¶¶ 14-16.) In other words, Plaintiffs expend money on OxyContin because it is their business to do so. As a result, they do not engage in the type of transactions that the UTPCPL was enacted to govern. *See Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 242 (3d Cir. 2002) ("Pennsylvania courts have distinguished purchases made for business reasons, which are not actionable, from those made for 'personal, family or household use.'"). The fact that OxyContin was ingested by Plaintiffs' members or dependents does not change the analysis. *See DiLucido v. Terminix Int'l, Inc.*, 676 A.2d 1237, 1242 (Pa. Super. 1996) (finding that the purchase of a service for the benefit of another and not one's own personal use did not fall under

14

the UTPCPL), *abrogation on other grounds recognized by Toy v. Metro Life Ins.*, 928 A.2d 186

(Pa. 2007).

Additionally, the UTPCPL is designed to level the playing field between those

sophisticated in business dealings and those who are inexperienced by providing consumers with

a mechanism for legal relief in certain circumstances of fraud or deception. *See In re Smith*, 866

F.2d 576, 581 (3d Cir. 1989) ("The objective of the [UTPCPL] . . . is to 'place on more equal

terms seller and consumer.'") (citation omitted). Because the UTPCPL was modeled on the FTC

Act, Pennsylvania state courts have traditionally looked to the FTC Act and decisions under it for

guidance in interpreting the UTPCPL. *See, e.g., Algrant v. Evergreen Valley Nurseries Ltd.*

*Pshp.*, 941 F. Supp. 495, 500 (E.D. Pa. 1996).

The FTC Act was not enacted "for the protection of experts, but for the public - that vast

multitude which includes the ignorant, the unthinking and the credulous, who, in making

purchases, do not stop to analyze, but are governed by appearances and general impressions."

*Gulf Oil Corp. v. FTC*, 150 F.2d 106, 119 (5th Cir. 1945); *accord Charles of the Ritz Distribs. v.*

*FTC*, 143 F.2d 676 (2d Cir. 1944); *Aronberg v. FTC*, 132 F.2d 165 (7th Cir. 1942). As the New

Jersey Supreme Court recently made clear in a case very similar to this one, the process by which

Third Party Payors like Plaintiffs decide to place a prescription medicine on their formularies

bears no resemblance to the kind of consumer transaction regulated by the FTC Act and

UTPCPL:

> Third party payors do not independently select medications for
> inclusion in their formularies. Instead, each third party payor relies
> on Prescription Benefit Managers ("PBMs") whose functions
> include placing prescription drugs on the individual third party
> payor's formulary. ***PBMs, in turn, utilize specialized committees***
> ***of pharmacists, physicians, and healthcare professionals, which***
> ***are known as Pharmacy and Therapeutics Committees ("P&T***

15

> *Committees"), to develop and maintain the formularies. The*
> *P&T Committees do so by conducting their own evaluation of the*
> *effectiveness, safety, and cost of each available medication.*

*See International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.,*

*Inc.*, 929 A.2d 1076, 1080 (N.J. 2007) (emphasis added). It is hard to conceive of a decision-

making process less like that typical of the kind of consumer the Pennsylvania Legislature

intended to protect with the UTPCPL. Unlike third-party payors, ordinary consumers obviously

do not have the assistance of their own "specialized committees" of "experts" when they decide

to buy something for themselves.[6] Plaintiffs are sophisticated merchants in the business of

providing healthcare benefits to their customers, not "consumers" who purchase goods for

"personal, household, or family use." *See, e.g., In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d

597 (S.D.N.Y. 2005) (dismissing third-party payors' claim for violation of the Louisiana Unfair

Trade Practices Act based on alleged misrepresentation of the safety and efficacy of diabetes

drug because the plaintiffs did not "use, purchase, or lease" a good for personal, household, or

family use).

C.     **Plaintiffs' UTPCPL Claim Fails Because Plaintiffs Have Not Pleaded the**
       **Elements Necessary to State a Claim.**

Even if entities like Plaintiffs could bring a claim under the UTPCPL (which they clearly

cannot), and even if the UTPCPL applied to cases of alleged misrepresentation of the safety of

prescription drugs (which it also does not), Plaintiffs' UTPCPL claim would still fail as a matter

of law because Plaintiffs' allegations are inadequate to state a cognizable claim under the statute.

---

[6]     Consumer transactions involving prescription drugs are, of course, different than typical
consumer transactions because the consumer/patient does have the benefit of expert advice from
the prescribing physician. This is, of course, why the UTPCL does not apply to consumers of
prescription drugs. *See supra* section II(A).

The pleading requirements for a UTPCPL claim differ depending on the particular provision of the UTPCPL asserted. *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392 (E.D. Pa. 2006). In vague and conclusory terms, Plaintiffs identify four provisions of the UTPCPL that were allegedly violated by Purdue's conduct. (Compl. ¶ 46.) However, Plaintiffs have not pleaded the elements necessary to maintain a claim based on <u>any</u> of these provisions.

### 1. Plaintiffs Do Not Allege Reliance.

Any claim under the UTPCPL, regardless of the section at issue, must allege that the plaintiff relied on the allegedly wrongful conduct. "[I]n order to allege a violation of *any provision* of the UTPCPL, a plaintiff must allege that she justifiably relied on defendant's act or practice, and that she suffered an ascertainable loss as a result." *See Baker*, 440 F. Supp. at 412 (emphasis added) (citing statement by the Supreme Court of Pennsylvania in *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004), that "[t]o bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance").

Plaintiffs do not plead reliance in this case and certainly not with the particularity required by Rule 9(b). The Complaint nowhere alleges that any of the Plaintiffs heard and/or relied on any of Purdue's alleged misrepresentations. Instead, Plaintiff artfully obscures the issue by alleging that (1) Purdue "misrepresented, concealed and/or omitted to inform Plaintiffs" of the adverse health effects of OxyContin; (2) Purdue's conduct was "*likely to deceive* and/or in fact *caused Plaintiffs*" to "purchase or reimburse for excessive purchases of OxyContin;" and (3) Purdue "*intended* that Plaintiffs" rely on the alleged misconduct. (Compl. ¶¶ 47-49) (emphasis added). Missing from this convoluted set of allegations is any allegation that Plaintiffs actually heard and relied to their detriment on the alleged misrepresentations. This

17

omission is fatal to Plaintiffs' claim. *See, e.g., Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004) (granting summary judgment to prescription drug manufacturer on consumers' UTPCPL claim because the consumers did not establish that they relied on any misrepresentations by the manufacturer).

For the reasons explained more fully below, even if this single, boilerplate assertion that Purdue misrepresented information to Plaintiffs actually included the missing element of reliance, it would be insufficiently particular under both Rule 8 and Rule 9(b). *See infra* Section II.C.3. This is especially true given that it would then be contradicted by the few arguably specific factual allegations contained in the Complaint, all of which allege that Purdue misrepresented information to "physicians," "prescribers," and "healthcare professionals." (*Compare* Compl. ¶ 47 *with* Compl. ¶¶ 19-20, 34.) It would also contradict Plaintiffs' theory of recovery -- which depends on the alleged influence of Purdue's alleged misconduct on those who prescribed and those who ingested (or diverted) OxyContin. *See supra* Section I(B).

### 2. Plaintiffs failed to plead a false advertising claim.

Plaintiffs allege that Purdue violated the UTPCPL provision which prohibits false advertising. (Compl. ¶ 46.) Under 73 P.S. § 201-2(4)(v), a person may not represent "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have." The law is clear that in order to state a claim under this provision, a plaintiff must allege that he actually heard and believed the advertising claimed to be false. *See Weinberg v. Sun Co., Inc.*, 565 Pa. 612 (Pa. 2001) (allegation that Sunoco advertisements induced consumers to purchase a high level octane gas that was not necessary

18

was held insufficient, absent allegations that the consumer purchased the gasoline because he heard and believed the alleged false advertising).

To state a claim in this case, Plaintiffs must allege that they actually heard and believed advertisements by Purdue relating to OxyContin's efficacy and safety, and that they purchased OxyContin as a result of these advertisements. Plaintiffs do not allege that they personally saw, heard, read, or otherwise became aware of any advertisement by Purdue, let alone that they purchased OxyContin as a result of such advertisement. Indeed, there is not a single advertisement or other promotional claim identified with even the most minimal particularity anywhere in the Complaint. At best, Plaintiffs refer "generally" to alleged "promotional statements" concerning the addiction potential and abuse liability of OxyContin. (*See, e.g.,* Compl. ¶ 34). As to who made these alleged misstatements, when they were said, where they were published (if at all), and whether anyone in particular heard and relied on them, Plaintiffs say nothing. This is fatal to Plaintiffs' putative false advertising claim under the UTPCPL. (*See, e.g., id.*)

### 3. Plaintiffs failed to plead a misrepresentation claim.

Plaintiffs allege, (Compl. ¶ 46), that Purdue violated the UTPCPL provision which prohibits a person from "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." 73 P.S. § 201-2(4)(vii). To prevail on a fraud-based claim under the UTPCPL, a plaintiff must allege with particularity the elements of common law fraud, including reliance. *See Walter v. Magee-Womens Hosp. of UPMC Health Sys.*, 876 A.2d 400, 406 (Pa. Super. 2005) (affirming dismissal of fraud claim for failure to state a claim because plaintiffs did not identify a misrepresentation that was material to the transaction); *see also* Fed. R. Civ. P. 9(b); *Acito v. IMCERA Group, Inc.*,

19

47 F.3d 47, 51 (2d Cir. 1995) (fraud-based claim must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent'").

As shown above, Plaintiffs have utterly failed to plead the who, what, why, where, and how of the alleged fraud. A single, conclusory allegation that "misrepresentations" concerning the "health effects" of OxyContin were directed towards and/or concealed from Plaintiffs, unsupported by the facts set forth in the remainder of the Complaint, is simply not sufficient. (*See* Compl. ¶ 47.) Rather, Plaintiffs must plead with particularity the details of the specific misrepresentation or omissions they relied on in purchasing or reimbursing OxyContin. Plaintiffs have not met, and cannot meet, the standards of Rule 9(b) in this case. The purported claims must therefore be dismissed.

### 4. Plaintiffs failed to plead a guarantee/warranty claim.

Plaintiffs allege, (Compl. ¶ 46), that Purdue violated the UTPCPL provision which prohibits a person from "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made." 73 P.S. § 201-2(4)(xiv). Under this provision, a seller gives the buyer a written guarantee or warranty "if the seller intentionally sets forth the guarantee or warranty in letters, words or the equivalent on a physical medium and gives the guarantee or warranty to the buyer in that form." *Tesauro v. Quigley Corp.*, No. 1011, 2001 WL 1807782, at *4 (Pa. Com. Pl., Apr. 9, 2001). The Complaint does not allege that Purdue provided any such guarantee or warranty about OxyContin directly to Plaintiffs, and no such guarantee or warranty exists for any prescription drug. Therefore, this provision cannot be the basis for a cause of action.

20

### 5.    Plaintiffs failed to plead a claim for other fraudulent or deceptive behavior.

Finally, Plaintiffs allege, (Compl. ¶ 46), that Purdue violated the UTPCPL "catch-all" provision which prohibits a person from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). Pennsylvania state courts and federal courts applying Pennsylvania law have repeatedly held that the elements of common-law fraud, including reliance, must be pleaded to maintain a claim under this provision. *See, e.g.*, *Baker*, 440 F. Supp. 2d at 412 ("[I]n order to allege a violation of any provision of the UTPCPL, a plaintiff must allege that she justifiably relied on defendant's act or practice."); *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 9 (Pa. Super. 2004) ("[T]o establish a private right of action under the UTPCPL, a plaintiff must demonstrate that he/she detrimentally relied upon the deceptive practice of the defendant and that the plaintiff suffered harm as a result of the reliance.") *aff'd* 928 A.2d 186 (Pa. 2007); *Sexton v PNC Bank*, 792 A.2d 602 (Pa. Super. 2002) (holding that the plaintiff could not maintain a UTPCPL claim against PNC Bank under the catch-all provision because she did not allege reliance); *see also Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 752 (E.D. Pa. 2007) (citing *Toy*, 792 A.2d at 9). As noted above, Plaintiffs have not pled the elements of common law fraud with anything approaching the particularity required by Rule 9(b).

### D.    Plaintiffs' Consumer Fraud and Unjust Enrichment Claims are Preempted by The Food, Drug, & Cosmetic Act and FDA Regulations.

Plaintiffs' claims, based on Defendants' allegedly misleading and fraudulent conduct in the advertising and promotion of OxyContin, impermissibly frustrate the extensive and specific regulatory scheme developed under the FDCA, and the implementing regulations adopted by FDA and are therefore preempted. *Pa. Employees Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d

239, 251 (3d Cir. 2007) (Third-party payor's consumer fraud claim preempted by the "extensive federal legislative and regulatory framework"). To avoid repetition, Purdue incorporates by reference here the argument it made in Section III(D) of the brief it filed in support in its Motion For Judgment on the Pleadings in *New Mexico Fund v. Purdue, et al.*, No. 07 CV 6916.

### III.     Plaintiffs' Warranty Claim Fails Because There is No Implied Warranty of Merchantibility for Prescription Drugs Under Pennsylvania Law.

Plaintiffs' implied warranty claim (Count III) alleges that Purdue "in the manufacture, marketing and sale of OxyContin impliedly warranted to Plaintiffs and the Class that said drug was fit for its particular ordinary purpose, that being to provide safe and effective treatment for chronic pain, and had lower risk of addiction and abuse." (Compl. ¶ 60.)  However, under Pennsylvania law, there is no implied warranty of merchantability for prescription drugs.  In *Makripodis v. Merrell-Dow Pharms.*, 523 A.2d 374 (Pa. Super. 1987), the Superior Court of Pennsylvania dismissed a claim for breach of implied warranty of merchantability asserted against a retail pharmacist, reasoning that "the very nature of prescription drugs themselves precludes the imposition of a warranty for fitness for 'ordinary purposes,' as each individual for whom they are prescribed is a unique organism." *Id.* at 377.  The reasoning of *Markipodis* has been extended to bar claims for breach of implied warranty of merchantability brought against a seller of prescription drugs.  *See, e.g.*, *Colacicco*, 432 F. Supp. 2d. at 548-49 (dismissing consumer's claim for breach of implied warranty in connection with the sale of prescription drug Paxil); *Heindel*, 381 F. Supp. 2d at 371 ("[U]nder Pennsylvania law, a claim for breach of implied warranty of merchantability may not be maintained against a seller of prescription drugs.").  The Court should follow the reasoning of *Markipodis* and *Colacicco* and dismiss Plaintiffs' implied warranty claim here.

22

**IV.    Plaintiffs' Negligence Claim is Barred by the Economic Loss Doctrine.**

To state a claim for negligence under Pennsylvania law, a plaintiff must allege that "the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *See Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998). Subject to limited exceptions no applicable here, Pennsylvania courts apply the economic loss doctrine to bar a plaintiff "from recovering purely economic losses suffered as a result of a defendant's negligent or otherwise tortious behavior, absent proof that the defendant's conduct caused actual physical harm to a plaintiff or his property." *Ellenbogen v. PNC Bank*, 731 A.2d 175, 188 n.26 (Pa. Super. Ct. 1999).

In analyzing Pennsylvania's adherence to the economic loss doctrine, it has been observed that:

> Pennsylvania state courts are quite hostile to torts alleging economic losses. Simply put, Pennsylvania 'courts have consistently refused to recognize a cause of action in negligence or strict liability for economic injury unattended by physical injury or damage to real or personal property.' Indeed, they have even refused to do so when the alleged negligence led to a serious nuclear disaster.

*See Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482, 491 (D. Pa. 2003) (internal citations omitted). Plaintiffs seek to recover economic damages for all "excessive, unnecessary, abusive, or diverted" prescriptions. (Compl. ¶ 35.) This is precisely the type of injury barred by the economic loss doctrine.

**V.    Plaintiffs Fail to State a Claim Under the Restatement (Second) of Torts § 402(B).**

The Restatement (Second) of Torts § 402(B) provides that:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for ***physical***

23

> **harm to a consumer** of the chattel **caused by justifiable reliance**
> upon the misrepresentation, even though (a) it is not made
> fraudulently or negligently, and (b) the consumer has not bought
> the chattel from or entered into any contractual relation with the
> seller.

RESTATEMENT (SECOND) OF TORTS, § 402(B) (emphasis added).  Accordingly, to state a claim

under this provision, a plaintiff must allege a defendant has misrepresented a material fact and

that (1) there has been physical harm to consumers, and (2) the physical harm to consumers was

caused by justifiable reliance upon the defendant's misrepresentations of material fact.  *See*

*Klages v. General Ordinance Equipment Co.*, 367 A.2d 304, 311 (Pa. Super. 1976) (adopting §

402(B) as the law of Pennsylvania).  As shown above, the Plaintiffs' Complaint fails to satisfy

either requirement.  *See supra* Sections II.C.1 and IV.

VI.    **Plaintiffs' Unjust Enrichment Claim Should be Dismissed Because There Is No
       Underlying Tort, No Allegation of Payment to Purdue, and Plaintiffs Continue to
       Reimburse For OxyContin Notwithstanding The Fact That They Must Know They
       Have Been Paying for Allegedly "Inappropriate" Prescriptions.**

Plaintiffs claim that Purdue has been unjustly enriched by the "wrongful conduct" that

formed the basis of Plaintiffs' UTPCPL, implied warranty, negligence, and misrepresentation

claims.  In the context of a tort action like this one, unjust enrichment "is essentially another way

of stating a traditional tort claim (*i.e.*, if defendant is permitted to keep the benefit of his tortious

conduct, he will be unjustly enriched)."  *Steamfitters Local Union No. 420 Welfare Fund v.*

*Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999).  Where, as here, the "traditional tort

claims" have been dismissed "because of the remoteness of the plaintiffs' injuries from

defendants' wrongdoing," there is "no justification for permitting plaintiffs to proceed on their

unjust enrichment claim."  *Id.; see also In re Guidant*, 484 F.Supp.2d at 985 (dismissing unjust

enrichment claim under Pennsylvania law because the third-party payor's claims were "too

remote"). Thus, this Court should dismiss the unjust enrichment claim, along with Plaintiffs' UTPCPL, breach of warranty, negligence, and misrepresentation claims.

Moreover, even if Plaintiffs' underlying claims could somehow survive this motion to dismiss (which they cannot), the unjust enrichment claim suffers from its own, independent failings and must be dismissed. To state a claim for unjust enrichment, a plaintiff must show, *inter alia*, benefits conferred on defendant by plaintiff. *See Walter*, 876 A.2d at 407 (citation omitted). Even taking Plaintiffs' conclusory allegations as true, Plaintiffs did not confer a benefit on Purdue. When a party has an independent obligation to provide a benefit, as Plaintiffs do in this case, any incidental benefit that a third-party derives therefrom is not subject to an unjust enrichment claim.[7] *See Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) (citing RESTATEMENT OF RESTITUTION § 106 (1937)). As alleged, Plaintiffs provide prescription drug benefits plans and coverage to their members and their members' dependents. (Compl. ¶ 14.) Pursuant to these plans, the Plaintiffs purchased and/or reimbursed their members' purchases of OxyContin. (Compl. ¶ 15.) There is no allegation that Plaintiffs actually paid Purdue directly or interacted with Purdue in any way. There is only the suggestion that Purdue benefited because, in Plaintiffs' satisfaction of their reimbursement obligation to their members, Purdue's drugs happened to be purchased by those members. Such tenuous inferences do not support a claim for unjust enrichment. *See In re Rezulin Prod. Liability Litig.*, 392 F. Supp. 2d at 619-21 (interpreting New Jersey law and rejecting health benefit providers' claim for unjust enrichment based on the absence of a sufficient relationship between the plaintiffs and the defendant drug manufacturer).

---

[7]    Pennsylvania law does not require a plaintiff to confer a "direct" benefit on a defendant. *See, e.g., Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 419-20 (E.D. Pa. 2006). However, a benefit must still be "conferred" and not merely end up with a defendant.

25

Plaintiffs' unjust enrichment claim fails for the additional reason that Plaintiffs continue to reimburse their members for allegedly "excessive, unnecessary, abusive, or diverted purchases of OxyContin" even though they must have known for years that they were doing so. *See infra* Section VII (describing widespread reports of abuse and diversion of OxContin and the thousands of claims (including TPP claims) that were filed against Purdue as a result). As a number of courts have recognized, where as here, "the plaintiff, acting with knowledge of the facts, pays for the product and continues to use the product, there is no unjust enrichment and recovery is barred." *Whalen v. Pfizer, Inc.*, No. 600125/05 2005 WL 2875291, at *5 (N.Y. Sup. Ct. Sept. 22, 2005); *see also Prohias v. Pfizer, Inc.*, 485 F.Supp.2d 1329, 1334-35 (S.D. Fla. 2007) (unjust enrichment claim against pharmaceutical company defendant failed as a matter of law where, as here, the plaintiffs "still pay for Lipitor notwithstanding their knowledge of its alleged lack of benefits") (emphasis in original).

**VII.    Plaintiffs' UTPCPL, Unjust Enrichment, Warranty, Negligence, and Misrepresentation Claims Are Barred by the Applicable Statute of Limitations.**

A district court presiding over a case subsequent to a transfer of venue pursuant to 28 U.S.C. § 1404 applies the state law of the transferor state. *Van Dusen v. Barrack*, 376 U.S. 612 (1964). Accordingly, Pennsylvania statute of limitations governs Plaintiffs' claims. Plaintiffs' UTPCPL, Unjust Enrichment, Breach of Implied Warranty, Negligence, and Misrepresentation Under Restatement (Second) of Torts § 402(B) are all barred by the applicable statute of limitations.

Claims brought under the UTPCPL are subject to a six-year statute of limitations. *See Gabriel v. O'Hara*, 534 A.2d 488, 494-95 (Pa. 1987); *see also* 42 Pa. C.S. § 5527(6). Claims brought for unjust enrichment and breach of implied warranty are both subject to a four-year

26

statute of limitations.  *See* 42 Pa. C.S. § 5525; *see also Cole v. Lawrence*, 701 A.2d 987, 989 (Pa.

Super. 1997).  Negligence claims are subject to a two-year statute of limitations.  *See* 42 Pa. C.S.

§ 5524.  No reported Pennsylvania decision addresses the statute of limitations for a

misrepresentation claim based on Restatement (Second) of Torts § 402(B).  Because § 402(B)

requires a showing of physical harm to a consumer based on misrepresentations of material fact

made by a defendant, a Pennsylvania court would likely hold a § 402(B) claim is subject to a

two-year statute of limitations.  *See* 42 Pa. C.S. § 5524(7) (providing a two-year statute of

limitations for "[a]ny other action or proceeding to recover damages for injury to person or

property which is founded on negligent, intentional, or otherwise tortious conduct").

    In July 2001, Purdue incorporated an FDA-approved "black box" warning, the strongest

warning for an FDA-approved drug, on all OxyContin labels [to] call attention to the drug's

potential for misuse, abuse, and diversion and limit the class of patients for whom OxyContin is

appropriate." *Howland v. Purdue Pharma L.P.*, 821 N.E.2d 141, 143 (Ohio 2004).  Accordingly,

there can be no dispute that by July 2001 -- at the very latest -- third-party payors such as

Plaintiffs who are in the business of providing prescription drug benefits either knew or should

have known about the possibility that some of the OxyContin prescriptions they covered could

be abused, diverted, and used excessively.  Consequently, Plaintiffs' claims for negligence (two-

year statute of limitations), misrepresentation under § 402(B) (two-year statute of limitations),

unjust enrichment (four-year statute of limitations), and breach of implied warranty (four-year

statute of limitations) were time-barred no later than July 2003 and July 2005, respectively.[8]

---

[8] Even if the boxed warning standing alone was not sufficient to put plaintiffs on notice of their
negligence, misrepresentation, unjust enrichment, and breach of implied warranty claims (which
it was), thousands of articles had been published and hundreds of individual and class actions
had been filed against Purdue by May 2003 (four years before this case was filed), evidencing

Additionally, even Plaintiffs' cause of action subject to the longest statute of limitations, the UTPCPL claim (six-year statute of limitations), should be dismissed as time barred.  In considering a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court may consider matters capable of judicial notice, including items published in newspapers, without converting the motion to one for summary judgment.  *See Shah v. Meeker*, 435 F.3d 244, 249-50 (2d Cir. 2006) (affirming dismissal of case as time barred; plaintiff was put on inquiry notice, and the statute of limitations began to run, when an article was published in *Fortune* magazine which included coverage of the conduct that formed the basis of plaintiff's claims). Plaintiffs assert Purdue violated the UTPCPL by misrepresenting and concealing information about "the dangerous nature of OxyContin in terms of its potential for causing addition [sic], dependency, and resulting likelihood of abuse and diversion for non-medical use."  (Compl. ¶ 47.)  A review of OxyContin press coverage demonstrates that Plaintiffs were on inquiry notice of these issues, and the statute of limitations on their UTPCPL claims began to run, prior to May 14, 2001.  Specifically, coverage of OxyContin prior to May 14, 2001, in the Philadelphia area, where each of the Plaintiffs has an office, included mention of the following:

- A report that "[OxyContin] is appearing on the streets as a new narcotic of choice. When chewed, snorted, or injected, OxyContin produces a rush like heroin -- an addiction that can be just as hard to break."  The article further reports that "Local awareness of OxyContin - known on the street as 'oxys' or 'OCs' - was sparked

---

that even the most cloistered third-party payor would have been on notice of its putative claim. (A search of news articles published prior to May 14, 2003 using the term "OxyContin" in Westlaw "ALLNEWS" database yielded more than *five thousand hits*; (*see* Declaration of Paulette Peterson ¶ 2 (*303* cases involving claims similar to those at issue here had been filed by May 2003)).  In fact, *by September, 17 2001*, there were already *two third-party payor claims* filed against Purdue.  *See McGraw v. Purdue Pharma*, No. 01-C-137-S (W.Va. June 11, 2001) (Attached as Exh. A to Peterson Decl.); *Allied Services Division Welfare Fund v. Purdue Pharma*, No. 2001-L-1458 (Ill. Sept. 17, 2001) (Attached as Exh. B to Peterson Decl.). Regardless of the lack of merit of such claims, there is no reason Plaintiffs should be permitted sleep on their claims for almost six years after their fellow TPPs had filed suit.

this month by the arrest of eight Gloucester County residents on charges that they submitted fraudulent claims and bilked health-care programs for thousands of dollars in OxyContin prescriptions."  Marc Levy, *Powerful Painkiller Pops Up On The Streets*, THE PHILADELPHIA INQUIRER, 2001 WLNR, 2412846, February 27, 2001, at p. A01.

- The death of a high school student caused by "a deadly combination of alcohol and OxyContin."  The article reports that the death "is one of at least 20 in Philadelphia since last November in which [OxyContin] was one of the contributing factors" and that "[OxyContin] abuse is becoming a growing problem worldwide."  Nicole Weisensee, *Killer*, PHILADELPHIA DAILY NEWS, 2001 WLNR 1633803, Feb. 27, 2001, at p. 3.

- A "community meeting at 26th Police District headquarters . . . to warn residents of the potentially deadly risk of the increasing popularity of OxyContin abuse."  Mark Ludak, *Residents Share*, PHILADELPHIA DAILY NEWS, 2001 WLNR 1635376, Feb. 28, 2001, at p. 8.

- A report that OxyContin "is being abused throughout the East," that people were known to abuse OxyContin by "crushing the pills into powder and snorting it, or injecting it to get a euphoric high similar to that of heroin," and that as a result OxyContin "sells on the illegal drug market for up to $100 a pill."  Roger Alford, *Across the East, Abuse of Painkiller Meant for Cancer Patients Is Rising*, THE PHILADELPHIA INQUIRER, 2001 WL 2425791, Feb. 10, 2001, at p. A08.

These examples demonstrate that by early 2001, OxyContin received extensive coverage in the

Philadelphia media.  As if that were not enough, coverage in the national media was even more

extensive by this time.  In fact, by May 14, 2001, hundreds[9] of articles had been published in

newspapers and magazines around the country concerning the abuse and diversion of

OxyContin.  *See, e.g.,* Barry Meier, *U.S. Asks Painkiller Maker to Help Curb Abuse*, THE NEW

YORK TIMES, 2001 WLNR 3357947, at A16 (May 1, 2001); Ian Zack, *Drug Abusers Turn the*

*Spotlight on a Pair of Shy Pharmaceutical Moguls*, Forbes, 2001 WLNR 7730142 (Feb. 5,

2001); Tomothy Roche, *The Potent Perils of a Miracle Drug:  OxyContin is a Leading*

*Treatment for Chronic Pain, But Officials Fear it May Succeed Crack Cocaine on the Street*,

---

[9]     This estimate is based on a search using the term "OxyContin" in the Westlaw "ALLNEWS" database.

TIME, 2001 WLNR 10076065 (Jan. 8, 2001). OxyContin abuse was also big news on television and radio. *See, e.g., Feds Seek to Limit Painkiller Use,* ABC News (May 1, 2001) (Attached as Exh. A to Strauber Decl.); *Painkiller Drug Bust: Drug Busts Uncover Abuse of OxyContin,* ABC News (Feb. 9, 2001) (Attached as Exh. B to Strauber Decl.); *Prescription Pain Medication OxyContin is Quickly Becoming the Drug of Choice For Many Abusers,* NPR: ALL THINGS CONSIDERED, 2001 WLNR 11928904 (Jan. 26, 2001). Accordingly, Plaintiffs were on inquiry notice of "the dangerous nature of OxyContin" (Compl. ¶ 47), and the possibility that they may have reimbursed their members for abused and/or diverted OxyContin (Compl. ¶ 35) before May 14, 2001. As a result, the six-year statute of limitations on Plaintiffs' UTPCPL claims expired prior to the filing of the Complaint on May 14, 2007.

## CONCLUSION

For the foregoing reasons, Purdue respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

s/Donald I Strauber

Donald I Strauber
Mary T. Yelenick
Phoebe A. Wilkinson
Gretchen N. Werwaiss
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY  10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
dstrauber@chadbourne.com

*COUNSEL FOR*
*THE PURDUE DEFENDANTS*

Chilton D. Varner
Stephen B. Devereaux
King & Spalding LLP

30

1180 Peachtree Street, NE
Atlanta, GA  30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Patrick S. Davies
Joshua D. Greenberg
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: 202.662.6000
Fax: 202.662.6291

*OF COUNSEL FOR*
*THE PURDUE DEFENDANTS*